## THE STATE v. PACIFIC GUANO COMPANY.

1. When the state comes into her own courts to assert a right of property, she is bound by all the rules established for the administration of justice between individuals.
2. When the state sues for the recovery of land she can recover only on the strength of her own title; but as sovereign and the source of title, she may rest upon this *prima facie* showing, until the defendant makes proof that her original title has been divested.

3. The title to the soil in all navigable streams in which the tide ebbs and flows, remains in the state, and does not pass under her grant of the superjacent land; but tidal channels are navigable in law only when they are navigable in fact for trade and commerce by craft of some kind. *Cases cited and reviewed.*

4. Whether a cause is a "case of chancery" can only be determined by considering whether it belongs to that class which, previous to the constitution of 1868, would have been appropriately presented in the court of chancery.

5. Information by the attorney general on behalf of the state to recover damages for an intrusion upon her soil and to enjoin further trespass, is substantially an action for the recovery of real property and is not "a case of chancery." This court therefore cannot review findings of fact by the Circuit judge in such a case; but if the right existed, the findings in this case would not be disturbed.

6. A grant by the state of the lands on the shore of a navigable tidal channel, gives title only to high water mark.

7. Whether a grant can issue from the executive department of the state government for lands as "vacant" down to low water mark, not determined, the question not being raised by proper exception.

8. The acceptance of a grant in aid of title previously claimed does not estop the grantees from setting up any other prior or more extended title, if they can do so.

9. Under a deed calling for a boundary in the middle of the channel of tidal navigable streams, the defendant could not claim the presumption of a grant to the soil below common high water mark under color of title.

10. Can the state be disseised in such manner as to be divested of title either under the statute of limitations or by the presumption of a grant against her remonstrances? And if so, could such disseisin be effected by a mere constructive possession for any length of time under color of title only?

11. The state holds the beds of the channels of her tidal navigable streams for the public use of her citizens; such property may be disposed of by an act of the legislature, but may not be granted by her officers as "vacant land."

12. It not having been the policy of the state to part with her right to such beds of channels, an act of the legislature making a grant of any part of them cannot be presumed.

13. For these reasons, a grant from the state cannot be presumed in favor of one who after purchase of several grants bordering on both sides of tidal navigable streams, caused all these lands to be included in one survey and plat, and thereafter held under such plat claiming the whole.

14. The fact that the state had granted the right to another corporation

to dig and mine for phosphates in these streams does not prevent the state from bringing this action to assert her title to the soil.

15. The value of the phosphates taken by the defendant corporation from the soil of the state should be estimated at the value of the phosphates, less the amount defendant has added to their value by their removal and preparation for market, defendant having acted under an honest but mistaken belief in its right to these phosphates.

Before WALLACE, J., Beaufort, November, 1883.

The opinion fully states the case. The Circuit decree was as follows:

This information, on behalf of the state, alleges as the cause of action that the defendants on the first day of August, 1882, and at divers times before and after that date, at Palmer's creek, otherwise known as Fisherman's or Sheephead creek, at Big creek, at Haulover creek, at Horse creek, at South Wimbee creek, and at Chisolm's otherwise known as Frenchman's or House creek, navigable waters in the County of Beaufort and State of South Carolina, useful for the purposes of trade and commerce, and in which the tide from the sea ebbs and flows, did intrude upon the rights and property of the State of South Carolina, by removing from the beds of the streams named before, below high water mark, large quantities of phosphate rock and phosphatic deposits, and converting the same to their own use, and demands damage therefor and an injunction to perpetually restrain defendants from continuing the acts complained of. The answers of the defendants are in substance a denial that the beds of the creeks named are the property of the state. Whether they are or not is the leading question in the case.

The state rests her claim to the property upon her rights as successor to the British crown to the fee of all vacant ungranted lands in the limits of her territory. 3 *Kent's Com.*, 377, 521. The defendants, admitting this right of sovereignty, claim that their grantors having been in possession of the beds of these creeks and holding them adversely for a century, they are entitled to the legal presumption that they entered under a grant, and that the title of the state is now in these defendants.

The legal rule under which defendants claim is certainly well

established, and nowhere more clearly stated than by Mr. Justice Evans in the case of *McLeod* v. *Rodgers and Gardner*, 2 *Rich.*, 19. Says the learned judge: "Ever since the case of *McLure* v. *Hill*, 2 *Mill Con. R.*, 420, it has been regarded as the settled law in this state that twenty years' continuous adverse possession is as good a title as a grant or a deed, where there is an absence of any of those facts which go to rebut the presumption. After a possession continued for so long a time undisputed by any, and acquiesced in by all, the law will presume that the possession in its incipiency was rightful, and that the tenant when he took possession did so under a grant or deed, or whatever may be necessary to invest him with the legal title. He who claims under a presumption of a grant is entitled to stand on the same ground as if he produced the grant. The law substitutes the presumption in place of the grant." These principles have been frequently affirmed by the courts of the state since the case of *McLeod* v. *Rodgers.* See *Riddlehoover* v. *Kinard*, 1 *Hill Ch.*, 378; *Godfrey* v. *Schmidt, Cheves. Eq.*, 57; *Boyce* v. *Lake*, 17 *S. C.*, 481.

The defendants, with the view of bringing themselves within the scope of the rule first stated, produce and put in evidence the will of Mary Bull, dated May 1, 1781. This will devises "all the lands included within the ditch of Bull's Island, in Prince William's parish," to Daniel Blake, Miles Brewton, and Arthur Middleton, in trust for her granddaughter Mary Butler. Defendants also put in evidence a conveyance which recites the will of Mary Bull above referred to, and conveys "all that plantation, island, or tract of land situate, lying, and being in Prince William's parish, in the state aforesaid, containing by estimation four thousand (4,000) acres, more or less; butting and bounding to the south, southeast, and southwest on Coosaw river, to the east and northeast on Bull river, north, northeast, and west by certain tide waters flowing from Coosaw and Bull's rivers into a creek or channel commonly called by the name of Bull's ditch."

These instruments, both the will and the deed, describe the land penetrated by the creeks in question, and defendants establish an unbroken chain of paper title to themselves down from these papers to the present time, and claim that their grantors and

themselves have held the land adversely under this color of title for a much longer period than is sufficient to raise the presumption of a grant. The case of *McLeod* v. *Rodgers*, *supra*, is authority for the rule that for the purpose of making out a state of facts upon which to predicate the presumption of a grant, the possession of grantors and grantees may be connected.

In reply to this ground it is insisted that as time does not run against the sovereign, a grant cannot be presumed against the state when she comes into court to establish her proprietary rights, and that such defence can only prevail in actions between individuals. And, secondly, it is insisted that no such adverse possession of the beds of these creeks has been established as is necessary to raise the presumption of a grant, even if such presumption could be set up against the state. In regard to the doctrine of *nullum tempus* interposed in answer to the defence, it may be observed that until a recent period, when the state by her own act provided otherwise, the statute of limitations did not run against the state, and no proprietary right of hers could be barred by it. The reason of the rule is twofold. First, because the plea admits the right, but claims that it is barred by laches, and laches cannot be imputed to the sovereign. Second, because an intrusion or trespass upon the land owned by the state does not operate to dispossess the state, and there is no time of ouster from which the statute could ever begin to run. 1 *Bl. Com.*, 247; 3 *Wash. Real Prop.*, 191, 159, and cases there referred to; *Harlock* v. *Jackson*, 1 *Tread.*, 135; *State* v. *Arledge*, 1 *Bail.*, 551.

The presumption of a grant, however, proceeds upon different assumptions. "One who claims under the statute was a trespasser throughout, and his possession began in a trespass and so continued until the statutory time had run out." *McLeod* v. *Rodgers, supra*. The presumption of a grant is the negation of a trespass. It does not impute laches or claim the benefit of a successful disseisin. It does not claim title against, but from, the state. Instead of producing the highest evidence of a grant, to wit: the grant itself, a rule of evidence which is now also a rule of property, allows the proof of certain facts to establish the equivalent of a grant to put the tenant in the same strong position that he would occupy if he held an actual grant that he was able

to produce. No right of the state is thus denied. Time does not run against her and create a bar, but proof of years of acquiescence are allowed to raise the presumption of the performance of a sovereign act. To attribute a voluntary act to a free and intelligent agent, and to hold others bound by it, while the agent himself was not, would be unreasonable. It appears, therefore, that the reasons why the statute of limitations does not run against the state do not apply to the presumption of a grant, and such presumption may be set up against the state.

The next question to be considered is, have the defendants made out such a case of adverse possession as is sufficient to raise the presumption of a grant of the beds of the creeks ? The lands held by this state as successor to the British crown, were with very limited exceptions held for the purpose of being granted to settlers. Any freeman who chose to institute and pursue the prescribed method of proceeding to that end, could obtain a grant to vacant land. Hence the reasonableness of the grounds of the presumption of a grant. These grants, too, when bounded on fresh water rivers or on their margins carry the exclusive rights and title of the grantee to the middle of the stream; for according to the common law the beds of fresh water rivers are the property of the adjacent proprietors. *Cates* v. *Wadlington*, 1 *McCord*, 580; *McCullough* v. *Wall*, 4 *Rich.*, 84. So the beds of fresh water streams, whether navigable or not, stand upon the footing of land not covered by water, and were held only to be granted. Upon the other hand, when grants of land were bounded upon navigable streams in which the tide from the sea ebbs and flows, the right and title of the grantee only extended to the river, and did not include any part of its bed. 3 *Kent's Com.*, 427 and 428; *Shands* v. *Triplett*, 5 *Rich. Eq.*, 77.

It would seem, therefore, that the common law in its wisdom made a difference in the effect of grants of land, whether bounded upon fresh water streams and navigable streams in which the tide ebbs and flows; and that beds of streams of the latter class were not held by the state solely for the purpose of being granted to individuals, as the adjacent land was. The inference cannot be resisted, therefore, that the beds of this class of streams were held by the state in trust for the use and benefit of all her citi-

zens who might desire to avail themselves of their privilege. While the state, as sovereign, had perhaps the power to grant these beds, they were not held by her entirely for that purpose, and to do so might in some degree be held a breach of duty. It will be obvious, therefore, that if a grant of these beds can be presumed at all, it would require stronger proof than would be sufficient to raise such a presumption in relation to the adjacent. land. *Palmer* v. *Hicks*, 6 *Johns*, 133, and notes; *Commonwealth* v. *Roxbury*, 75 *Mass.*, 451.

These observations are intended to apply to only *navigable* streams in which the tide ebbs and flows; for although every stream in which the tide ebbs and flows is, according to the common law, *prima facie* a navigable stream, yet this presumption may be rebutted by showing that the conditions and objects of navigation do not exist. In the case of the *Mayor of Lynn* v. *Turner*, *Cowp.*, 86, Lord Mansfield is reported to have said: "How does it appear that this is a navigable stream? The flowing and reflowing of the tide does not make it so, for there are many places into which the tide flows which are not navigable rivers, and the places in question may be a creek in their own private estate." In *Miles* v. *Rose*, 5 *Taunt*, 706, Gibbs, C. J., said: "The flowing of the tide, though not absolutely inconsistent with the rights of private property in a creek, is strong *prima facie* evidence of its being a public navigable river;" and Heath, J., expressed the same opinion.

In our own case of the *State* v. *Duncan*, 1 *McCord*, 404, the question considered by the court was whether a creek in which the tide ebbed and flowed was such a highway, for the obstruction of which an indictment would lie. In the report of the case the words highway and navigability seem to be used as meaning the same thing, and the case, therefore, lends some support to the view just stated. If a channel, therefore, in which the tide ebbs and flows, and in the language of the civil law is floatable, can be used for the purpose of trade and commerce, it is a navigable stream. Neither the character of the craft with which it is accomplished, nor the relative ease or difficulty of the navigation, are tests of navigability.

In the case of *The Montello*, 20 *Wall.*, 441, the following

language occurs : "It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels it could not be treated as a public highway. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river rather than the extent and manner of that use. If it is capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway. Vessels of any kind that can float upon the water, whether propelled by animal power, by the wind, or by the agency of steam, are or may become the mode by which a vast commerce can be conducted, and it would be a mischievous rule that would exclude either in determining the navigability of a river." In the case of *The Danied Ball*, 10 *Wall.*, 563, the court hold that those rivers are navigable in law, which are navigable in fact; and they are navigable in fact when they are used or are susceptible of being used in their ordinary condition as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

By applying the tests, derived from the above cited cases, to the creeks in controversy here, it will be at once perceived that Big creek and Chisolm's creek are not navigable streams. Although the tide ebbs and flows through them, yet the conditions necessary to sustain trade or commerce of any kind do not exist. Flowing out of Coosaw river with the tide into Chisolm's Island, they lose themselves in the marshes with which they are surrounded. They are entirely in the private estate of the owners of the island and make no connections with thoroughfares of travel or trade, and are none themselves. With regard to South Wimbee, Horse Island, Haulover, Palmer's and Fish creeks, the case is different. Each of these constitute part of water communications between the two great navigable thoroughfares—Coosaw and Bull rivers. It appears in the testimony that each can be, and has been, navigated with small craft by any and all who chose to so use them. The navigation of parts of some of them may be difficult, but it has been proven to be practicable. South Wimbee connects waters of Coosaw and Bull

rivers through Bull's ditch; Horse Island creek, out of Bull river, connects with Palmer's creek out of Coosaw, by means of Haul-over creek and Grand Doll gutters. That this latter connection has existed from time immemorial is proved by a conveyance of Horse Island by William Bull to John Bull in 1748, in which Horse Island is described as "bounded to the northeastward on a creek running out of Coosaw river into Bull river," &c. This is the creek referred to as Horse Island creek, and it reaches Coosaw river now by means of Grand Doll gutters, Haulover, and Palmer's creek. Fish creek, too, runs out of Bull river and forms a junction with Palmer's creek. I am satisfied from the testimony that this latter creek has afforded means of communication from Bull river to Palmer's creek from time immemorial, yet, at the point called the Hammock, I am equally satisfied that it has been artificially widened. These creeks, therefore, to wit: Horse Island, Haulover, Palmer's, Fish, and South Wimbee creeks, are navigable waters in which the tide ebbs and flows.

It now becomes necessary to inquire into the alleged adverse possession of the beds of these last named creeks by the defendants and their grantors. The defendants have taken actual possession of the beds of these creeks, and by damming up some of them and mining in them, have clearly evinced their intention to hold them as their private property against any one. Their acts in pursuance of a claim of right are of a nature to raise the presumption of a grant if the duration of their possession had been sufficient. This latter essential, however, is wanting, as their deed bears date on June 3, 1877, unless they can connect themselves with such a possession on the part of their grantors as will sufficiently supplement their own.

As has been seen, the defendants claim by adverse possession under the deed from Mary Bull above referred to, as color of title. It is important, therefore, to inquire what the will of Mary Bull conveyed. Several grants by the lords proprietors were put in evidence by the plaintiffs. While there may be some difficulty in locating some of them with certainty, yet there is no doubt that the part of Chisolm's Island penetrated by these creeks is covered by some of these grants. Those that relate to this part of the island call for metes and bounds that exist by the

same names now. They are bounded by creeks and marshes and rivers, but do not convey any channels. The claims of title which have their source in these grants all finally converge to Mary Bull. She owned the fee in all the land penetrated by these creeks under muniments of title, none of which covered the beds of these creeks. She, by her will, conveys all the land included within the ditch of Bull's Island. This includes the land penetrated by these creeks, except South Wimbee creek, which is the north, northeast, north, northwest boundary of the land.

The color of title of defendants, therefore, does not cover this creek, because the land is bounded on it, and it is a navigable stream in which the tide ebbs and flows, and right of grantee does not cover its bed. It would seem, too, that their color of title, while calling for the outlines of the island as boundaries, and ignoring the existence of the creeks, should be construed with reference to the light thrown upon the title of their grantor by the colonial grants. It is certain Mary Bull had no title to the creeks, but owned on all sides of them. She could convey only what she had, although the terms of her conveyance were general. I would be unwilling to hold, however, that defendants are restricted in their claim by the descriptions in the grants after they had renounced all claim under them. Yet it is clear that a chain of paper title, beginning at the paper title of these defendants, can be traced up to existing grants from the lords proprietors to all this land, except the beds of these creeks. The papers are in evidence in this case. The defendants, however, renounce all claim under the paper title, which they did not put in evidence, and rest upon their claim of the presumption of a grant. These facts are important with reference to the extent of the possession and the nature of the holding of defendants' grantors. They would seem to establish a strong probability that these grantors held under this claim of paper title until the value of the beds of the streams was discovered, and then renounced that part of it which did not include them.

While, therefore, the boundaries mentioned in Mary Bull's will, and in the conveyance of the trustees appointed by her, included the creeks, yet that would not of itself be sufficient

to raise the presumption of grant to the beds of these streams, nor is the fact of the boundaries sufficiently aided by the proof of the building of a bridge and the warning off a sloop which came to pick oysters, while the public used the streams for navigation at their pleasure. I do not think, therefore, that defendants have established a state of facts that makes out such an adverse holding of the beds of these streams for a sufficient length of time to entitle them to the presumption of a grant. It follows that the title is in the state.

It is argued on behalf of defendants that the state, having granted an exclusive right to other corporations to dig and mine and remove phosphate rock from the beds of these creeks, cannot, therefore, maintain this action. It is true there are acts of the General Assembly which grant to other corporators the right to remove phosphate rock from these creeks, but there is no proof that these corporators have ever availed themselves of the privilege, or performed the conditions on which it was to exist. But if they had, they would have only the right to enter upon the property of the state and remove the phosphates, and what they removed would be their property. The fee still remains in the state, and the right of property in all the phosphate rock not removed. For an unauthorized entry upon the land and injury to the property of the state, she has the right of redress.

It appears that defendants have been mining and removing valuable phosphate deposits from the beds of these creeks, and the state thereby having suffered wrong and injury is, according to familiar principles, entitled to damages. The measure of damages for a wilful trespass upon property, like that involved here, is the full value of the property, without deduction for labor and expense. But if the trespass is committed under an honest but mistaken belief of right, then the measure of damages is the value of the property, less the amount which the trespasser has added to its value by its removal and preparation for market. *Sedgwick on Damages*, 670–673; 36 *Am. Rep.*, 769, and notes. The trespass in this case, I am sure, belongs to the latter class.

It is therefore ordered, adjudged, and decreed: First. That the beds of the creeks on Chisolm's Island, known as Horse Island creek, Haulover creek, Fish creek, Palmer's creek, and South

Wimbee creek, are the property of the State of South Carolina. Second. That the defendants, their servants, agents, and employees, be perpetually enjoined from mining in and removing from the beds of said creeks phosphate rock and phosphatic deposits.    Third. That it be referred to Simeon Hyde, jr., Esq., to take testimony and report to this court what quantity of phosphate rock and phosphatic deposit have been taken from the beds of said creeks and converted to the use of defendants, and the value of the same in its natural state and position ; and that the State of South Carolina is entitled to a judgment for the sum so ascertained.    Fourth. That plaintiff have leave to apply at the foot of this decree for further necessary and proper orders.

*Messrs. A. T. Smythe, W. J. Verdier,* and *A. M. Lee, jr.,* for the plaintiff.

*Messrs. Simonton & Barker,* for defendants.

Possession under color of title for the period from 1799, when A. R. Chisolm went in, to 1882, creates the presumption of a grant for everything within the color of title, including the beds of these creeks, be they navigable or not.    What is color of title ?    When one sets up a claim based upon possession under color of title, whether it be deed, will, plat, or anything, such deed, &c., is used only to show the extent of the claim, and not as a muniment of title.    The title depends on the possession, and the office of the deed, &c., is to show the extent of the claim. The question is, does the possession by its duration warrant the presumption of title, and then the deed, plat, &c., is used to show the area of such possession ?    3 *McCord.,* 260 ; 2 *Id.,* 273 ; 2 *Hill,* 495 ; 11 *Am. Dec.,* 739 ; 14 *Id.,* 578, 580, and notes ; 18 *Id.,* 463.    Possession under color of a part is possession of the whole.    1 *Nott & McC.,* 357, 374 ; 1 *Mill Con. R.,* 85 ; 2 *Id.,* 426 ; 2 *Speer,* 451 ; 1 *Strob.,* 145.    Our possession for eighty-three years presumes a grant—is a grant.    1 *Bay,* 26 ; 2 *Bail.,* 101 ; 17 *S. C.,* 141.    And this as against the state, as well as against a citizen.    2 *Mill Con. R.,* 423 ; 2 *Rich.,* 22. We do not claim against the state by adverse possession, and

could not.   We claim under the state by the presumption of a grant from her.  Nor is this presumption affected by the fact that the land is the bed of a navigable stream.   3 *Kent*, 427; 7 *Cush.*, 82; 9 *Am. Dec.*, 507; 16 *Id.*, 54; 33 *Id.*, 329; 39 *Id.*, 685.  The state may grant these beds, provided the *jus publicum*, the right of passage, is not obstructed.  Whatever can be granted can be presumed to have been granted.  60 *E. C. L. R.*, 894.   Claims were distinctly made by building and maintaining a causeway and a bridge.

His honor objects to our presumption of a grant by saying that Mary Bull could not dispose of the beds of streams; but we do not rely on *title* under Mary Bull's will and the Butler deed, but on presumption from possession, using this will and deed to show the extent of our possession.   2 *Mill Con. R.*, 426; 2 *McCord*, 273; 3 *Id.*, 261.   He further holds that as our paper title covers all our claim, except these beds, the probability is that we held only under our paper title, until the discovery of these phosphates.   But the evidence shows that we always claimed them, and our paper title, traced back to the lords proprietors, does not cover all of our claim.   These colonial grants did not cover even all the marshes.   The presumption is that a subsequent grant was obtained covering this magnificent estate. 2 *Mill Con. R.*, 426.   The new grant of 1869, taken to perfect title, does not affect the claim under older deeds.   1 *Strob.*, 1; 7 *Wheat*, 535; *Herm. Estop.*, 249, 362, 366, 378, 386–7; 15 *S. C.*, 133; 1 *N. Y.*, 254; 39 *Am. Dec.*, 669; 43 *Id.*, 553.

These creeks are not navigable streams.   3 *T. R.*, 253; 10 *E. C. L. R.*, 414.   Fresh water rivers are called navigable. *Cheves*, 259; *Rice*, 450; 1 *McCord*, 582; 2 *Strob.*, 12.   And both salt and fresh water streams, indiscriminately, declared to be navigable.   10 *Stat.*, 300; 12 *Stat.*, 268, 474, 923; 13 *Stat.*, 288, 439; 16 *Stat.*, 840; *Gen. Stat.*, §§ 1062, 1097.   These creeks are not public highways, as defined in 1 *McCord*, 404–5. The Code of Procedure prescribes a statute of limitations, which, as to actions for the recovery of land, fixes twenty years; but section 109 establishes a rule of property applicable to all actions thereafter prosecuted,   We have been charged with the

value of the rock in position, but one dollar a ton is the royalty fixed by the state.

*Messrs. William Elliott* and *H. B. Sargent, jr.,* same side.

November 21, 1884. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. This action was commenced in September, 1882, by information filed on behalf of the state by the attorney general, under section 79, General Statutes, which provides that "the attorney general may, when in his judgment the interest of the state requires it, file and prosecute informations or other process against persons who intrude upon the lands, rights, or property of the state, or commit or erect any nuisance thereon."

The information alleged that the defendant company "The Pacific Guano Company," a corporation under the laws of Massachusetts, and William Weymouth, their superintendent, had intruded upon certain territory, the property of the state; that this property consisted of the beds of certain creeks known as South Wimbee creek, Fish or east branch of Palmer's creek (and sometimes called Sheephead or Fisherman's creek), Horse Island or Palmer's creek, Big creek (otherwise called Haulover cut), and Chisolm's creek—five in number—all tide waters between Bull and Coosaw rivers, in Beaufort County, and running through or forming the boundaries of what is now commonly called "Chisolm's Island"; that the beds of these creeks contained large deposits of phosphatic rock ; that the defendants had engaged in the business of digging and removing these deposits from said territory, and had removed large quantities therefrom and appropriated the same to their own use, and that they intended to continue so to remove such rock ; that the state had by sundry acts of the General Assembly asserted her interest and property in such deposits, and provided the manner in which those so desiring could lawfully dig for the same, with a penalty for those who dug unlawfully. The state therefore asked three hundred thousand dollars damages for the rock so unlawfully

removed, and for an injunction restraining the defendants from further intruding and removing such rock.

The defendants answered, denying the ownership of the state in the creeks named or in the phosphatic deposits therein. After issue joined and before trial the defendants filed a petition in the Court of Common Pleas for Beaufort County, praying that the case should be transferred to the United States Court. The petition was refused by the Circuit judge, and no further action was taken thereon. In October, 1882, an order was taken referring the case to Simeon Hyde, jr., to take the testimony and state an account of all the phosphate rocks dug by the defendants from the creeks mentioned in the information, or any of them; and requiring the defendants to enter into bond in the penal sum of fifty thousand dollars, conditioned to file monthly true and faithful returns with the clerk of the court of all rock dug from said creeks, from the date of the commencement of the action, and to pay such royalty or other damage as the court might ultimately determine, and on failure to execute such bond, enjoining them from further digging therein. The bond was executed and filed, and the defendants continue to dig under its provisions.

A number of references were held and much testimony taken, particularly as to the size, condition, and navigable capacity of the different creeks indicated. This testimony is all printed in the brief, and cannot of course be reproduced in this preliminary statement; but it may contribute to clearness to give a short outline of the general scope of the evidence.

The sea coast of the state, notably in the neighborhood of Beaufort, is characterized by a net-work of marine channels, in which, being very little above the level of the sea, the tide ebbs and flows. These channels, known as rivers or creeks, afford water communication, more or less perfect, according to their size and the state of the tide, to and from the mainland and among the numerous islands of this tide-water region. Coosaw or Chisolm's Island is one of the larger of them. It forms a long strip between Bull and Coosaw rivers. Bull river lies on the north, Coosaw river on the south, and the eastern end of the island is the point of intersection of these rivers. The western boundary is formed by South Wimbee creek, which runs in a

southwesterly direction from Bull river and meets Adam's creek, which runs in a northwesterly direction from Coosaw river. The junction of these two creeks is called "Haul-over cut." The three together, South Wimbee, Haul-over cut, and Adam's creek, make up the western boundary of "Chisolm's Island." The island itself, about seven miles long and two miles wide, is penetrated by a number of smaller creeks, each having on its margin strips of salt marsh, so that of the superficial area of the island at least three-fourths consist of water in the creeks, of salt marsh between high and low water mark, and of little islets.

There can be little doubt, indeed it was not seriously contested, that all the high land of the island had been granted before the revolution. Original grants of different parcels to different persons were in evidence from the lords proprietors and King George the Second, from 1703 to 1733. These grants had not been actually located, but it was manifest from inspection that they covered lands on the island, being "in free and common socage, with ye privilege of hawking, hunting, fishing, and fowling in ye boundaries of ye same, with all woods and trees and whatever else is thereon standing and growing, or therein being or thereunto belonging or in any manner appertaining, except all royal mines and quarries of gems and precious stones, and one-sixth part of all base minerals when digged," &c.

The Circuit judge upon this subject says: "Several grants were put in evidence by the plaintiff. While there may be some difficulty in locating some of them with certainty, there is no doubt that part of Chisolm's Island, penetrated by these creeks, is covered by some of these. Those that relate to this part of the island call for metes and bounds that exist by the same names now. They are bounded by 'creeks,' 'marshes,' and 'rivers,' but do not convey 'channels.' The claims of title which have their source in these grants all finally converge to Mary Bull. She owned the fee in all the land penetrated by those creeks, under muniments of title, some of which covered the beds of these creeks."

In 1771, Mary Bull executed her will, by which she devised "all the lands included within the ditch of Bull's Island [then the name of Chisolm's Island], in Prince William's parish, to

Daniel Blake, Miles Brewton, and Arthur Middleton, in trust for her granddaughter, Mary Bull." In 1797, Pierce Butler (husband of Mary Bull) and others conveyed by lease and release to Alexander R. Chisolm "all that plantation, island, or tract of land situate, lying, and being in Prince William's parish, in the state aforesaid, containing by estimation four thousand (4,000) acres, more or less; butting and bounding to the south, south-east, and southwest on Coosaw river; to the east and northeast on Bull's river; north, northeast, north northwest, and west by certain tide-waters flowing from Coosaw and Bull rivers into a creek or channel commonly called by the name of Bull's ditch." Henceforth the island was known as "Chisolm's Island." In 1826, Alexander R. Chisolm executed his will, by which he devised to his son, Edward Neuville Chisolm, the upper one-third of the island, and to his son, Robert Chisolm, the remaining two-thirds, for and during the term of his natural life, with remainder over, &c. The latter is the parcel now known as "Palmetto Hall," which the defendants afterwards purchased, and the present contention is as to creeks running through it.

Within a period comparatively recent, probably less than thirty years, the fortunate discovery was made that the beds and marshes of these marine channels contained large quantities of phosphatic rocks, making that valuable which before had been regarded-utterly worthless as property; and, as a consequence, the defendant corporation, in 1869, with a view to mining these deposits, took from the family of Robert Chisolm (through the court) a lease of Palmetto Hall, excepting the residence and one hundred acres adjacent. The lease was for a rental of $5,000 per annum, and included expressly "all and singular the waterways, landings, easements, and rights, members, hereditaments, and appurtenances to the said premises belonging," &c.

It seems that about this time some persons entertaining doubts as to the title of the Chisolms to the marshes on the different creeks not having been included in the grants of their vendors, filed with the clerk of the court for Beaufort County applications for warrants of survey of the same, and on or about July 30, 1869, James Adger, jr., John B. Warren, and Henry K. Silliman each took out a grant from the state of a separate and distinct parcel

of the marsh lands aforesaid. All these grants, after reciting that they were issued "in pursuance of an act of the legislature entitled, an act for establishing the mode of granting the lands now vacant in the state," &c., passed 19th day of February, 1791, conveyed marsh lands included within the lines of the plats attached, "and on each and every of said water courses extending to low water mark." Afterwards these grantees all released and relinquished their respective grants aforesaid and all interest therein, to the Chisolms, for the benefit of their lessees, the defendants.

Finally, in 1877, the defendant company purchased the whole property for $70,000, and, by authority of another proceeding in court and through the referee therein appointed, C. H. Simonton, Esq., received a conveyance of the same, which embraced all the right of the Chisolms under the three grants of marsh lands aforesaid, and "all that plantation or tract of land known as Palmetto Hall, situate in Prince William's parish in the state aforesaid, comprising two-thirds of Chisolm's Island (previously and in the will of A. R. Chisolm called Coosaw Island) containing about 1,500 acres of high land and ———— acres of marsh; and butting and bounding to the north on South Wimbee creek, extending to the middle line of said creek; to the east on Bull river, to the north on Coosaw river, extending to low water mark on said rivers, and to the west on that portion of said island now or late belonging to George S. Brown on which are located the works of 'the Coosaw Mining Company,'" &c. The Pacific Guano Company established their works near the mouth of Horse Island creek, or where it connects with the waters known as North Wimbee creek, or Bull river; and commenced to take the phosphatic deposits from the beds and streams of the South Wimbee and the creeks which penetrate into or through the island.

There had been a plat of the whole island made by one Gaspar Trotti in 1781, which being somewhat defaced by the abrasions of time, Mr. Chisolm had copied by W. B. Buckner, surveyor, in 1828. The dividing line between Edward and Robert Chisolm under the will of their father, was plainly marked on this copy plat, which also sets forth from the old Trotti plat the boundaries, creeks, marshes, little islands, and high land on the part of the

island which was given to Robert and is now know as "Palmetto Hall." Other plats of the same were in evidence, viz., a chart of the United States coast survey; resurveys especially with reference to the marsh lands made in 1868 by William Hume, jr., D. S.; plans of South Wimbee creek and the other creeks ranging through the island by Thomas W. Willett; and plat made by John W. Gregorie at the instance of the defendant company and for their use as late as 1883. This plat last named, shows that the whole superficial area of Palmetto Hall is 6,358 acres, of which 1,902 are high land, and that the remainder consists of marsh, little islands, and the creeks aforesaid. ·

In 1878 the legislature passed "an act to protect the rights and interests of the state in the phosphate rocks and phosphatic deposits in the navigable streams and waters of the state" (16 *Stat.*, 615), of which section 11 (p. 619) provides as follows: ·"That the stock of the Oak Point Company shall consist, &c., &c.; that said company, when organized in accordance with the provisions of this act, shall have the exclusive right to dig, mine, and remove phosphate rock and phosphatic deposits from the beds of Bull river and North and South Wimbee creeks," &c.

The cause came on to be heard by Judge Wallace, who held, among other things, that "Chisolm's creek and Big creek were not navigable streams. Although the tide ebbs and flows through them, yet the conditions necessary to sustain trade or commerce of any kind do not exist. Flowing out of Coosaw river with the tide into Chisolm's Island, they lose themselves in the marshes with which they are surrounded. They are entirely within the private estate of the owners of the island and make no connection with thoroughfares of travel or trade and are none themselves. With regard to South Wimbee, Horse Island, Haulover, Palmer's, and Fish creeks the case is different. Each of these constitute part of water communications between the two great navigable thoroughfares, Coosaw and Bull rivers. It appears in the testimony that each can be and has been navigated with small craft by any and all who chose so to use them. The navigation of parts of some of them may be difficult, but it has been found to be practicable. South Wimbee connects waters of Coosaw and Bull rivers through Bull's ditch. Horse Island creek,

out of Bull river, connects with Palmer's creek out of Coosaw, by means of Haulover creek and Grand-Doll Gutter.    That this latter connection has existed from time immemorial is proved by a conveyance of Horse Island by William Bull to John Bull in 1748 in which Horse Island is described as 'bounded to the northeastward on a creek running out of Coosaw river into Bull river,' &c.    This is the creek referred to as Horse Island creek, and it reaches Coosaw river now by means of Grand-Doll Gutter, Haulover and Palmer's creeks.    Fish creek, too, runs out of Bull river and forms a junction with Palmer's creek.    I am satisfied from the testimony, that this latter creek has afforded means of communication from Bull river to Palmer's creek from time immemorial, yet at the point called 'the Hammock' I am equally satisfied that it has been artificially widened.    These creeks therefore, to wit, Horse Island, Haulover, Palmer's, Fish, and South Wimbee, are navigable waters in which the tide ebbs and flows," &c.

And as to these last named creeks, overruling the defence that the defendants were entitled to the presumption of a grant from long possession of the high lands with color of title under a plat covering the whole island, the Circuit judge sustained the claim of the state to the beds of these streams, enjoined the defendant company from further mining in and removing therefrom phosphate rocks and phosphatic deposits, and referred it to a referee to take testimony and report what quantity of phosphatic deposits had been taken from the beds of said creeks and converted to the use of the defendants, and the value of the same in its natural state and position—holding that the measure of damages here should be the value of the property less the amount which the trespasser has added to its value by its removal and preparation for market, as the trespass was committed under an honest but mistaken belief of right.

From this decree both parties have appealed to this court, and the novel questions involved have been argued here with exhaustive research and great ability.

*Plaintiff's grounds of appeal.*    1. "Because his honor erred in not holding that the beds of Big and Chisolm's creeks are the property of the state.

2. "Because his honor erred in holding that grants bounding on tide waters, go to the centre of the stream unless the same be navigable in fact; whereas he should have held that grants bounding on any and all tide waters extend only to high water mark.

3. "Because his honor erred in holding that in a suit between the state and an individual, a grant can be presumed against the state from the possession of the defendant or his grantors.

4. "Because his honor erred in drawing a distinction as to the proof necessary to presume a grant to the soil under tide waters navigable in fact, and to the soil under other tide waters.

5. "Because his honor erred in holding that a presumption of a grant can arise from, and in connection with, constructive possession under color of title.

6. "Because his honor erred in holding that any presumption of a grant can arise in this case, the source of title being known.

7. "Because his honor erred in not holding that the defendants, having accepted valuable grants from the state as part of their title, are estopped from now denying the title of the state to the property so granted to them; and this whether they entered under such grants or not.

8. "Because his honor erred in not holding that even if a grant can be presumed against the state by constructive possession under color of title, the defendants are estopped from claiming under color of title which they now set up below low water mark on the creeks in question; because their grantors, for the very purpose of removing all cloud from their color of title, admitted and defined the extent of the same, by applying for and accepting grants from the state, which limited such claim to low water mark; and this with the concurrence of defendants.

9. "Because his honor erred in not holding that the defendants, having by valuable grants from the state fixed and settled the uncertain boundaries of their territory, are estopped from now claiming beyond the boundaries so fixed and settled."

*Defendants' grounds of appeal.* 1. "Because, when one is entitled to the presumption of a grant arising from possession under color of title, he stands before the court as if he had in his hands and produced to the court the grant of the state under its

seal for all the territory embraced within the bounds of his color of title ; and his honor erred in not holding this.

2. "Because possession of an area of territory under color of title for nearly one hundred years will presume a grant for every foot of such territory, and will include all the realty within the boundaries of the color of title ; and his honor erred in not holding this.

3. "Because the possession of a part of the territory included within clear and distinct boundaries as color of title, is possession of the whole and every part thereof within such boundaries ; and his honor erred in not so holding.

4. "Because the defendants proved an uninterrupted possession and user for nearly one hundred years by their grantors, Alexander Chisolm and Robert Chisolm, and his children, and themselves under color of title of 'all that plantation, island, or tract of land, situate, lying, and being in Prince William's parish, in the state aforesaid, containing by estimate 4,000 acres, more or less, butting and bounding south, southeast, and southwest on Coosaw river, east and northeast on Bull river, northwest and north, northwest, and west by certain tide-waters flowing from Coosaw and Bull rivers into a creek or channel commonly called Bull's ditch,' shown by a deed dated February 24, 1797, and referring to a plat of Gaspar Trotti, dated 1784; and because this creates the presumption of a grant for all the land covered or not covered by water included within these boundaries without exception or reservation ; and his honor erred in not holding this.

5. "Because his honor, having found as a question of fact that these instruments (the will of Mary Bull and the deed of the Butlers) described the land penetrated by the creeks in question, and that the defendants had established an unbroken chain of paper title to themselves, down from these papers to the present time, and claim that they and their grantors and themselves have held the land adversely under color of title for a much longer period than is sufficient to raise the presumption of a grant (which claim, as to a part of this land, is not disputed), should have held as a conclusion of law that they had established

a grant to the whole territory, land not covered as well as land covered by the waters of these creeks.

6. "Because the defendants put in evidence the deed of Butler and wife and the will of Mary Bull to show the extent of their claim and as color of title, not as evidence of title in the Butlers or in Mary Bull; and his honor erred in holding them to the proof of the validity of the title of Mary Bull.

7. "Because the plaintiff in this case, which is an action to try title, can only succeed on the strength of his own title; and his honor erred in deciding the case on the supposed flaw in the defendants' title.

8. "Because the grants produced by the plaintiff did not cover the territory claimed by the defendants, who, on the contrary, relied on another grant, one proved by presumption, covering all of the territory within certain known clear and distinct boundaries, and including the lands under the creeks in question; and his honor erred in not so holding.

9. "Because his honor erred in not holding that the state can grant the beds of navigable streams, and that a grant can always be presumed of that which is the subject of a grant.   .

10. "Because his honor erred in holding that if a grant of these beds can be presumed at all, it would require stronger proof than would be sufficient to raise such presumption in relation to the adjacent soil.         .

11. "Because his honor erred in holding that defendants' color of title, whilst calling for outlines of the island as boundaries, and ignoring the existence of the creeks, should be construed with reference to the light thrown upon the title of Mary Bull by the old colonial grants.

12. "That, on the contrary, his honor erred in holding that the Butler deed ignored the existence of the creeks, and should have held that the omission to except the beds of the creeks in question from the conveyance, showed an intent to convey them; that being within the color of the title, they were in fact conveyed, and that the grant thus presumed to the whole territory, including these beds, is independent of the colonial grants.

13. "Because his honor erred in holding that whilst the boundaries mentioned in Mary Bull's will, and in the deed of the

trustees appointed by her (the Butler deed) included the creeks in question, and that there was subsequent possession under these as color of title for one hundred years, yet this was not of itself sufficient to raise the presumption of a grant of the beds of these creeks.

14. "Because the acts of ownership of the creeks by the defendants and their grantors were such as the nature of the case required, and were sufficient; and his honor erred in not holding this.

15. "That no use of these streams by any other persons than the defendants and their grantors has been shown, except such as is perfectly consistent with their ownership of the soil underlying them.

16. "Because the evidence, taken as a whole, shows that the creeks in question are not such navigable streams, the beds of which are reserved as the property of the state.

17. "Because his honor erred in requiring the defendants to account for all the phosphate rock dug and mined in the beds of the creeks named by him, without distinguishing between rock dug and mined above low water-mark, and in not excepting the former from such accounting.

18. "Because his honor, having found as a question of fact that the defendants and their grantors had held for a period of more than forty years, under deed conveying all the territory penetrated by these creeks in question, and thus including these creeks, he erred in not holding the title of these defendants good as against the world.

19. "Because it having been proved that the state had granted to other persons the exclusive right to dig, mine, and remove phosphate rocks and phosphatic deposits from the bed of South Wimbee creek, the defendants cannot be called to account to the state for phosphate rocks so dug, mined, and removed from said creeks; but if accountable at all, they are accountable to the grantees of the state for such rock.

20. "Because his honor erred in his conclusion of fact that Fish creek had from time immemorial afforded means of communication between Bull river and Palmer's creek.

21. "Because his honor erred in his conclusion of fact that

Palmer's creek, Horse Island creek, and South Wimbee creek, are navigable streams."

We will not undertake to consider separately the exceptions of plaintiff and defendants, but take them up together according to the subject matter.

When the state comes into her own courts to assert a right of property she is, of course, bound by all the rules established for the administration of justice between individuals. This is practically an action for the recovery of real estate, and one of the rules of procedure applicable in such case is that the plaintiff must recover upon the strength of his own title, and not the weakness of the defendant's. Has that rule been violated in this case? The state at the close of the revolutionary war succeeded to all the territorial rights of the British crown and became the owner in fee, upon feudal principles, of all the lands within her limits which had not been granted by her predecessor. She exhibits no paper title. She acquired her right by the strong hand, and her title has been conceded by all the world, and especially by the former owner, by right of discovery and conquest. 3 *Kent*, 377.

These are historical facts of which the court will take judicial cognizance. Having once been the proprietor of the beds of the streams named in the information as a part of the soil of the state, she still owns them, unless she or her predecessor at some time and in some way was divested of title in them. She is the sovereign, the source of title, and upon this *prima facie* showing she rests, at least until it is removed by a counter-showing. That is for the defendants to make, if they can. Have they shown that they or those from whom they hold acquired title to these beds, either from the British crown before the revolution, or from the state since that time?

If we clearly understand the scope of the defence, it is not claimed that there ever has been an express grant for the beds in question. Such express grant for lands at all times under water, and as property regarded worthless, until the discovery of the phosphate deposits, was probably never desired or applied for; and if made, would not have been worth the cost of obtaining it, or even the paper on which it was written; but

the claim is that the vendors of the defendants were for a very long time—some eighty years—in possession of the high lands of Chisolm's Island; under a plat which covered the whole island, through which most of these channels penetrate, and that such possession of part with color of title to the whole island must be considered as giving title to the beds of these channels in one of two ways: either by construction of the grants of the high lands, that is to say, by force of the doctrine applicable to riparian propietors, which, in certain cases, gives to the owner of the soil on both sides of a stream title to the bed of that stream; *or*, *second*, that such long possession of the high lands under such color of title authorizes and requires the presumption of a new grant from the state, expressly covering and giving title to the beds of these streams.

Before these defences can be properly considered, it is necessary first to determine what is the character of these channels. Are they merely channels of inconsiderable character through a private estate, or are they public navigable waters? The doctrines of the common law as to the seashore and the soil lying under tide-waters and navigable streams were peculiar. The fundamental idea was that the property in the sea and tide-waters, and in the soil and shore thereof, was in the sovereign. In the view that they partook somewhat of the nature of the sea, the fact alone that the tide ebbed and flowed in a stream, was considered proof of its navigability. *Martin* v. *Waddell*, 16 *Peters*, 307; 3 *Kent*, 377. We know of no law or judicial decision which, up to this time, has changed that rule in this state. On the contrary, it has been decided more than once "that as to such waters the common law definition (those in which the tide ebbs and flows) has not been changed by any authoritative decision in this state." *McCullough* v. *Wall* (4 *Rich.*, 68), which was followed and repeated in the case of *Shands* v. *Triplett* (5 *Rich. Eq.*, 78), in which Chancellor Wardlaw said: "The term 'navigable' is equivocal. By the common law, rivers are regarded as navigable only to such extent as the tide flows and ebbs; and the property in the beds of rivers navigable in this sense, is undoubtedly in the state. But in our statutes and in

popular speech, 'navigable' rivers mean those which may be navi-
gated by ships or boats," &c.

This doctrine that all tidal streams are navigable, is purely
technical, and it would seem has not been regarded as entirely
satisfactory even in England, from what Lord Mansfield is
reported to have said in *The Mayor of Lynn* v. *Turner, Cowp.*,
86 : "How does it appear that this is a navigable river ? The
flowing and reflowing of the tide does not make it so, for there
are many places into which the tide flows which are not naviga-
ble rivers, and the place in question may be a creek in their own
private estate," &c. In the case of *King* v. *Montague,* 4 *Barn.
& C.*, 602, the court, in speaking of navigability arising from
the flowing of the tide, said : "The strength of this *prima facies*
arising from the flux and reflux of the tide must depend upon the
situation and nature of the channel. If it is a broad and deep
channel, calculated for the purpose of commerce, it would be
natural to conclude that it has been a public navigation ; but if
it is a petty stream, navigable only at certain periods of the tide,
and then only for a short time, and by very small boats, it is
difficult to suppose that it ever has been a perfect navigable chan-
nel," &c.

Nor has the technical standard of navigability always been
adhered to in this country. In the case of *The Daniel Ball,* 10
*Wall.,* 563, it was said by Mr. Justice Field : "The doctrine of
the common law as to the navigability of waters has no applica-
tion in this country. Here the ebb and flow of the tide do not
constitute the usual test as in England, or any test at all, of the
navigability of waters. There no waters are navigable, in fact,
or at least to any considerable extent, which are not subject to
the tide, and from this circumstance tide-water and navigable
water there signify substantially the same thing." See also
*Gould on Waters,* § 67.

In the case of *The Montello,* 20 *Wall.,* 441, the following lan-
guage occurs : "It would be a narrow rule to hold that in this coun-
try, unless a river was capable of being navigated by steam or sail
vessels, it could not be treated as a public highway. The capa-
bility of use by the public for purposes of transportation and
commerce affords the true criterion of the navigability of a river

rather than the extent and manner of that use. If it is capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway. Vessels of any kind that can float upon the water, whether propelled by animal power, by the wind, or by the agency of steam, are, or may become, the mode by which a vast commerce can be conducted, and it would be a mischievous rule that would exclude either in determining the navigability of a river," &c.

Following these cases, the Circuit judge, notwithstanding the positive rule of the common law as to the navigability of all tidal streams, held that even tidal channels are navigable in law only when they are navigable in fact, and in ascertaining whether they are navigable in fact, adopted the standards indicated in the above stated cases; and we cannot say that this was error of law. Taking the test as thus stated he considered the testimony and reached the conclusion before stated, that Big creek and Chisolm's creek are not navigable waters, but that Palmer's creek, Haulover, and Horse Island creek, making one continuous connection through the island, and Sheephead or Fish creek, a branch of Palmer's creek, making another such passage through the island, and South Wimbee creek, are public navigable waters. These were pure findings of fact by the Circuit judge, and if this is a law case, they must stand as a special verdict, not being subject to review by this court. In reference to the jurisdiction of this court, the words of the constitution are: "The Supreme Court shall have appellate jurisdiction only in cases of chancery, and shall constitute a court for the correction of errors at law, under such regulations as the General Assembly shall by law provide."

Is this a case in chancery? No matter what else it may be, if it is not a case in chancery, this court has no right to review the findings of fact. We do not understand upon what principle this can properly be called a case in chancery. Before the jurisdictions of law and equity were united, that question might possibly have been determined simply by the court from which the appeal came, but now we suppose it can only be determined by considering whether the case belongs to that class which previous

to the union would have been appropriately prosecuted in the court of chancery. There must have been some reason for the distinction in the constitution, probably arising out of the different forms of procedure or the nature of the remedies administered in the two courts; and if so, we must regard the real nature of the proceeding and issues joined, and not merely the form which they assume. "The circumstance that forms of proceedings as it regards law and equity, are assimilated under the code, does not affect the jurisdiction of this court as established under the constitution; but we look to the substantial character of the controversy before us for the purpose of ascertaining the extent of our powers in relation to said case, rather than to the nature of the court from which the case comes, in the technical mould in which the case is cast." *Sullivan* v. *Thomas*, 3 *S. C.*, 546.

Notwithstanding the technical mould in which the case comes to us (information by the attorney general on behalf of the state, praying, among other things, for an injunction), the substantial character of the controversy here certainly is an action for the recovery of real estate, which is in no respect equitable. But for the accidental fact that the state is the real plaintiff, the action would have been in form, trespass to try title, pure and simple. The form of information by the attorney general under the statute was adopted only for the reason that the state, on account of its supposed legal ubiquity, cannot be disseized or dispossessed, and therefore cannot maintain the direct action of ejectment or trespass to try title. *State* v. *Stark*, 3 *Brev.*, 104; *State* v. *Arledge*, 1 *Bail.*, 551. In the case of Stark, Judge Brevard evidently regarded the proceeding by information as in the Court of General Sessions. He says, "I have no scruple in saying, that if any judicial process is necessary, it must issue from the Court of General Sessions, and not from the Court of Common Pleas, because the breach of public rights or those which affect the whole community, considered as a community, is distinguished by the harsh appellation of crimes and misdemeanors. The redress of private injuries is to be sought by civil suit or action, but *public wrongs* require a more speedy remedy. 3 *Bl. Com.*, 2. An information of intrusion would probably be the most appropriate means of redress," &c.

We have not been able to take the view that the case is "in chancery," and therefore we have no right to review the findings of fact by the Circuit judge, which must stand as the established facts of the case. But, considering the unusual nature of the action as one of those prerogative proceedings allowed on the part of the state, in which injunctions are granted; and the earnest manner in which it has been pressed upon us that the proceeding is in analogy to that allowed in England on the equity side of the Court of Exchequer, which had in special charge the revenues of the crown; we have looked through the book of evidence in the case with care, and can only repeat the words of Judge McIver, in the case of *Gary* v. *Burnett*, 16 *S. C.*, 632: "We are not to substitute our judgment for that of the Circuit judge as to the comparative weight of the testimony. It is only where there is no testimony to support his conclusion, or where manifest error is shown that this court will undertake to overrule a finding of fact by a Circuit judge. * * * In this case there was certainly much conflict of testimony, and we cannot say that there was any such manifest error on the part of the Circuit judge as would warrant our interference," &c.

Assuming, then, the facts to be as found by the Circuit judge, Big creek and Chisolm's creek, not being navigable waters, go out of the case. We cannot hold that the bed of a creek not navigable, although tidal, belongs to the state to the exclusion of the riparian proprietor. But as to the other creeks found to be navigable, viz., Palmer's creek, connecting with Horse Island creek through Haulover, Fish or Sheephead, and South Wimbee creeks, the question recurs, what are the rights in the beds of these streams of the owners of the high lands of Chisolm's Island? Do they belong to the proprietors of the high lands upon the principle of riparian proprietorship? We think not. These are all channels in which the tide ebbs and flows, and as to such the well established rule is, that a grant of the shore gives title only to the high water mark, the mean between extreme high and low tides. Chancellor Kent says: "It is a settled principle of the English law that the right of owners of land bounded by the sea or on navigable rivers where the tide ebbs and flows, extends to high water mark; and the shore below common, but

not extraordinary high water mark, belongs to the public. * * * But grants of land bounded on rivers or upon the margins of the same or along the same above tide water carry the exclusive right and title of the grantee to the centre of the stream," &c. 3 *Kent,* 426, and authorities.

This is another rule of the common law, but unlike that which we have just considered in regard to navigability it has not, so far as we can understand, undergone any modification whatever in this country. It seems to have been considered that there are not the same reasons here for modifying the rule of the common law as to boundaries on arms of the sea, as exist in reference to that of navigability: some change in the latter being made necessary by the size and importance of the fresh water rivers in our wide and extended territory. But be that as it may, the rule as to boundaries on navigable tide waters or arms of the sea is well established both in England and America. 3 *Wash. Real Prop.,* 634; *Tyler on Boundaries,* Chap. 2, 3; *Angel on Tide Waters,* Chap. 2; *United States* v. *Pacheco,* 2 *Wall.,* 587.

In this connection it is proper to advert to the new grants, taken out from the land office in the manner usual as to vacant lands, by certain gentlemen in 1869 and assigned to the defendants, which reach below the common law line of proprietorship on such streams, and cover what is generally known as the "flats," "shore," or "marsh," down to low water mark. Upon this subject the defendants complain, in their 17th ground of appeal, that the Circuit judge required them to account for all the phosphate rock dug and mined in "the beds" of the creeks named by him "without distinguishing between rock dug and mined above low water mark and the rock dug and mined below low water mark, and in not excepting the former from such accounting." We think this view is founded upon a misconception of the Circuit decree. It is true that the Circuit judge did not in express terms make the distinction indicated between high and low water mark; but he held that "the beds" of certain creeks, naming them, on Chisolm's Island are the property of the state, and from the decree itself, as well as the course of the argument, and the admission of plaintiff's counsel, who introduced in evidence the grants of 1869, we understand that the state did not claim "the marsh"

lands covered by the grants, and that the Circuit judge meant by the phrase "beds of the streams," the bottom proper, or the soil lying below low water mark. Assuming this to be the proper construction of the judgment below, the state did not except upon the point, and therefore the question as to whether the grants of 1869 were issued by proper authority and are binding upon the state, is not before us for adjudication.

The state, however, by her 9th exception, did claim that the defendants, by accepting the grants which reach down to low water mark, thereby acknowledged that to be the full extent of their right; "that having by valuable grants from the state, fixed and settled the uncertain boundaries of their territory, they are estopped from now claiming beyond the boundaries so fixed and settled"; that is to say, beyond low water mark. We do not think that the acceptance of these grants in aid of their title estopped the defendants from setting up any other prior or more extended title if they could do so. *Herman on Estoppel*, 249, 362, 366; *Cruger* v. *Daniel, McMull. Eq.*, 157. "It would be too much to say that, if a man who is in possession under a good or even colorable title, buys in a defective title, he will thereby defeat his own object, and be estopped from relying on his better right, as an answer to a prior deed or mortgage of the vendor." *Herman Est.*, § 228; *Blight's Lessee* v. *Rochester*, 7 *Wheat.*, 535.

This brings us to the defence most earnestly urged for the defendants—that the possession of the Chisolms from 1797, under a plat extending to the boundaries of the whole island, creates the presumption of a grant from the state for everything within the island, including the beds of these streams, whether they be navigable tide waters or not; or, to state it in the words of one of defendants' counsel: "If we were in possession under color of title of any part of the island or tract of land included within the boundaries of Trotti's plat, we were in possession of every atom of soil, of every blade of the marsh of the land not covered by water, and of all the lands covered by water within these boundaries * * * * and such possession presumes a grant, is in fact a grant of the premises embraced in the color of title, and that in an action by the state herself as well as by a citizen."

That is to say, as soon as all the different parcels of the island become the property of one person, and he had it, in consolidated form, represented by one plat, calling for the outer boundaries of the island, henceforth that person was in possession of everything within the island, unaffected by the terms of the grants of the different parcels under which he purchased, which, being no longer necessary, might be discarded as the true chain of title, substituting therefor a grant by presumption coincident with the boundaries of the plat.

Upon this subject the Circuit judge held: "It would seem that their color of title, while calling for the outlines of the island as boundaries, and ignoring the existence of the creeks, should be construed with reference to the light thrown upon the title of their grantors by the colonial grants. It is certain Mary Bull had no title to the creeks, but owned on all sides of them. She could convey only what she had. I would, however, be unwilling to hold that defendants are restricted in their claim by the descriptions in the grants after they had renounced all claim under them, yet it is clear that a chain of paper title, beginning at the paper title of the defendants, can be traced up to existing grants from the lords proprietors to all these lands except the beds of those creeks. The defendants, however, renounce all claim under the paper title and rest upon their claim of a presumption of a grant. These facts are important with reference to the extent of the possession and nature of the holding of defendants' grantors. * * * * I do not think, therefore, that defendants have established a state of facts that makes out such an adverse holding of the beds of these streams for a sufficient length of time to entitle them to the presumption of a grant. It follows that the title is in the state."

In this result reached by the Circuit judge we concur, but upon grounds somewhat different from those stated by him. In the first place, it is proper to observe that this defence does not embrace South Wimbee. That is not one of the creeks which penetrates Chisolm's Island, but is one of its boundaries. No claim is made that the defendants or any of their vendors ever owned the soil on both sides of it, or that it is within their color of title. The deed of the defendants purports to convey the bed

to the middle of the stream; but assuming the fact heretofore established, that it is a navigable tidal channel, we do not see how the defendants can have in the bed of this boundary any greater right than they have in the beds of the other boundaries, Coosaw and Bull rivers, as to both of which, by the express terms of their own deed, they only claim down to low water mark. That also is the limit of their right in the South Wimbee.

As to the other creeks which penetrate the island, it is clear that the defendants cannot claim their beds, as heretofore explained, against the state, by adverse possession under the statute of limitations.   Until 1870, the doctrine of *nullum tempus occurrit regi* prevailed in this state, and since that time twenty years had not elapsed, so that it is not necessary to consider the scope and effect of the new provision in the code as to when and under what circumstances "the state will not sue."   It is also quite clear that down to the year 1869, when the defendants took their first lease from the Chisolms and began to mine for phosphatic deposits, there had been no actual adverse possession of the beds of these channels, unless the building of a bridge across one of them and warning off a sloop which came to pick oysters can be considered as such possession.

But without entering into the question whether the state, having title and theoretical ubiquity to the full extent of her boundaries, could be disseized in such manner as thereby to be divested of that title, either under the statute of limitations or by the presumption of a grant against her remonstrance; and if so, whether that could be effected by mere constructive possession for any length of time under mere color of title, or in any way short of an actual *pedis possessio* for the whole period required; it seems to us enough to call attention to the peculiar character of the rights to be taken from the state by the proposed presumption of a grant.

The state had in the beds of these tidal channels not only title as property, the *jus privatum*, but something more, the *jus publicum*, consisting of the rights, powers, and privileges derived from the British crown, and belonging to the governing head, which she held in a fiduciary capacity for general and public use; in trust for the benefit of all the citizens of the state, and in

respect to which she had trust duties to perform. 3 *Kent*, 377 ; *Martin* v. *Waddell*, 16 *Peters*, 367 ; *Commonwealth* v. *Roxbury*, 9 *Gray*, 451. The absolute rule heretofore referred to, limiting land owners bounded by such streams to the high water mark, unless altered by law or modified by custom, accords with the view that the beds of such channels below low water mark are not held by the state simply as vacant lands, subject to grant to settlers in the usual way through the land office.

There seems to be no doubt, however, that the state as such trustee has the power to dispose of these beds as she may think best for her citizens ; but not being, as it seems to us, subject to grant in the usual form under the provisions of the statute regulating vacant lands, it would seem to follow that in order to give effect to an alienation which the state might undertake to make it would be necessary to have a special act of the legislature expressing in terms and formally such intention. In this view, the state, asserting her rights to the deposits "in the beds of the navigable streams and waters of the state," has, by numerous special acts of her legislature, granted licenses to different companies to mine in these beds, imposing penalties on those who undertake to do so without such license. *General Statutes*, § 65.

Under the proof in this case, the court could not presume a special act of the legislature making the beds of these streams the private property of individuals. The doctrine is well settled that no act of the legislature will be presumed against the policy of the state. It will not be presumed that the law-making power of the state, overlooking the rights and duties of the state, enacted a law in conflict with what was declared to be the best interest and true policy of the state. Counter presumptions intervene and forbid it. *Lyons* v. *Holmes*, 19 *S. C.*, 409 ; *Vinyard* v. *Passalaigue*, 2 *Strob.*, 536. "Presumptions are called the intendments of the law. They are in pursuance of the allowed principles or permissions of the established law ; but cannot be permitted when they are in hostility to them." We are not aware that it has been the practice of the state to grant to private individuals absolute title to the beds of these tidal streams. At least we have been cited to no case in which it has been done below low water mark by an act of the legislature either passed

in fact or presumed to have been.     We see nothing to show an intendment of the law to that effect.

What was so well said of the North Wimbee by Judge Maher in his able circuit opinion never appealed from, in the *Oak Point Mine Case*,[1] may be appropriately applied to the beds of the creeks in question here: "As to the title to the bed of the creek below ordinary low water mark, I hold that it is in the state. No express grant conveying this land has been produced.     No long continued acts of ownership in the bed of the creek have been shown in support of a prescriptive right.     *Angel Tide Waters*, 96 ; *Tyler Bound.*, 36.     The possession for forty (or eighty) years of the adjacent land by those under whom the defendants claim undoubtedly raises the presumption of a grant coextensive with the limits of such possession.     But to extend the boundary to the centre of the creek would be to overturn an established principle of the common law, which has never yet been questioned by any court in England or this country.     The tendency of the American decisions has been to restrict riparian proprietorship, even upon navigable rivers above the tide, and not to enlarge it in respect to navigable streams in which the tide ebbs and flows.     Wherever the common law test of navigability has been repudiated, the common law consequences of navigability have been held to attach.     Nothing more can be claimed under the grant presumed from the possession of the upland than would result from an express grant calling for the creek as a boundary, conceding that usage (in this case express grant) would carry the line to low water mark.  The principle on which it could be extended further, upon the facts of this case, is not to be found in the common law, nor in any decision that has come within my notice."

Finally, it is urged that the state cannot maintain this action, at least as to South Wimbee, for the reason that she had previously granted to others the exclusive right to dig, mine, and remove phosphate rocks from the bed of that creek, "and the defendants cannot be called upon to account to the state for phosphatic deposits so mined and removed from said creeks ; but if accountable at all, they are accountable to the grantees of the state

---

[1] Printed in full as an appendix to this volume.—REPORTER.

for such rock," &c.   We do not consider the action as brought
to recover the phosphates which have been discovered in the
aforesaid streams.   That may have prompted the bringing of the
action, but its avowed object is to establish the ownership in the
soil of the beds.   This includes, of course, the phosphates or
any other deposits which may happen to be found there, but the
right of the state to the soil is the same, whether phosphates
exist there or not.   The act of 1878 provides that "The Oak
Point Company," when organized, "shall have the exclusive right
to dig, mine, and remove phosphate rock and phosphatic deposits,
from the beds of Bull river and North and South Wimbee
creeks," &c.   It does not appear in the evidence that the "Oak
Point Company" ever organized or accepted this grant.

But assuming that they did, they are not here making objec-
tion to this action.   If they were, however, such objection could
not prevail.   The act contains no words of grant of the soil, nor
of anything that implies it.   The right "to dig, mine, and
remove phosphate rocks and phosphatic deposits," &c., simply
confers an authority, a privilege, or franchise, like the per-
mission to exclude the tide from the Roxbury flats for the pur-
pose of a mill-power.   In all grants from the government to the
subject, the terms of the grant are to be taken most strongly
against the grantee, and in favor of the grantor, reversing the
rule as between individuals, on the ground that the grant is sup-
posed to be made at the solicitation of the grantee, and the form
and terms of the particular instrument of grant proposed by him
and submitted to the government for its allowance.   But this rule
applies *a fortiori* to a case where such grant by a government to
individual proprietors is claimed to be not merely a conveyance
of title to land, but also a portion of that public domain which
the government held in a fiduciary relation, for general and
public use.   *Commonwealth* v. *Roxbury*, 9 *Gray*, 492.   The act
conferred upon the Oak Point Mine Company simply a license
"to dig phosphates," and did not carry the title to the soil, which
remained in the state.

We see no reason to doubt the correctness of the conclusion on
the Circuit, that another reference was necessary.   It may have
the effect of preventing injustice.   In regard to the principle on

which the judge directed the damages to be ascertained, we see no error. We concur with him that the defendants mined in the beds of these streams running through their lands under an honest but mistaken belief of their right to do so.

The judgment of this court is that the judgment of the Circuit Court, as interpreted herein, be affirmed.