552 S.E.2d 778

**LOWCOUNTRY OPEN LAND TRUST, Respondent,**

v.

**STATE of South Carolina and James A. Atkins, of Whom James A. Atkins is, Appellant.**

No. 3388.

Court of Appeals of South Carolina.

Heard March 5, 2001.
Decided Sept. 10, 2001.

98

Newman Jackson Smith, of Nelson, Mullins, Riley & Scarborough, of Charleston; and Kenneth P. Woodington, of Columbia, for appellant.

W. Foster Gaillard and Elizabeth Henry Warner, both of Buist, Moore, Smythe & McGee, of Charleston, for respondent.

SHULER, J.:

In this quiet title action, James A. Atkins appeals the master-in-equity's ruling that Lowcountry Open Land Trust, as fee simple owner of tidelands adjoining the Ashley River, can bar Atkins from "wharfing out" over its land to obtain access to the river. We affirm.

## FACTS/PROCEDURAL HISTORY

By deed dated June 7, 1991, the Legare family donated 448.40 acres of marshland on the west bank of the Ashley River to Lowcountry Open Land Trust (LOLT).[1] Two months later James Atkins purchased an adjacent upland lot. Thereafter, the South Carolina Department of Health and Environmental Control (DHEC) provisionally approved a permit authorizing Atkins to build a sixty-foot dock across LOLT's property to the Ashley River.

On June 3, 1996, LOLT filed a declaratory judgment action against the State of South Carolina pursuant to S.C.Code Ann.

---

1. LOLT is a non-profit, charitable corporation formed to preserve and protect coastal areas in South Carolina by obtaining title to real property and conservation easements.

§ 48–39–220 (1987),[2] seeking a declaration of fee simple title to the 448.40–acre tidelands tract. The court permitted Atkins to intervene, and referred the case to the Master–in–Equity for Charleston County on January 20, 1998.[3]

The master held a trial on May 10, 1999 on partly-stipulated facts, including the following:

LOLT is record owner of a 448.40 acre tract of marshland ("the 448 acre tract") located on the Ashley River in Charleston County.... By stipulating that LOLT is the record owner of the 448 acre tract, the State of South Carolina does not concede that LOLT owns the tidelands.

Purported title to the tract derives from that certain Grant of the State of South Carolina dated March 7th, 1836, pursuant to an Act of the Legislature entitled "An Act for Establishing the Mode of Granting the Lands Now Vacant in This State, and for Allowing a Commutation to be Received for Some Lands That Have Been Granted" passed the 19th day of February, 1791, said Grant being executed by George McDuffie, Governor and Commander–in–Chief in and over the State of South Carolina, to Edward C. Peronneau, filed in the South Carolina Department of Archives and History in State Grants Volume 0–6, Page 125 (Control No. 98), together with plat showing and depicting eleven hundred two (1,102) acres surveyed on January 14, 1836, said plat being annexed to the foregoing Grant and being

---

**2.** This section provides for a legal action against the State to determine an interest in tidelands, defined as "all lands except beaches in the Coastal zone between the mean high-water mark and the mean low-water mark of navigable waters without regard to the degree of salinity of such waters." S.C.Code Ann. § 48–39–220(A) (1987). As will we, the master used the technically distinct terms "tidelands" and "marshlands" interchangeably. *See* S.C.Code § 48–39–10(G) (1987) (" 'Tidelands' means all areas which are at or below mean high tide and coastal wetlands, mudflats, and similar areas.... Coastal wetlands include marshes, mudflats, and shallows and means those areas periodically inundated by saline waters...."); *Phillips Petroleum Co. v. Mississippi,* 484 U.S. 469, 477 n. 6, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988) (stating Court jurisprudence employing the term "tidelands" takes its common meaning of " 'land as is affected by the tide.' " (quoting *Black's Law Dictionary* 1329 (5th ed.1979))).

**3.** LOLT has appealed the dock construction permit and DHEC has withheld final approval pending resolution of this action.

filed in State Plat Volume 41(1), Pages 99–100, South Carolina Department of Archives and History.

Exhibit B is a true and correct copy of that certain grant of the State of South Carolina dated March 7, 1836. . . .

Exhibit C is a true and correct copy of the plat annexed to and made a part of Exhibit B, said plat showing and depicting 1102 acres of marsh situate on the west side of the Ashley River, said plat being certified by James Kingman, Deputy Surveyor General, on February 10, 1836.

The 448 acre tract is a portion of the marshlands shown on the plat attached hereto as Exhibit C.

Such private title, if any, which exists in the intertidal marshes located on the 448 acre tract extends in an unbroken chain from the grant of the State of South Carolina. . . .

On September 28, 1999, the master issued an order confirming fee simple title in LOLT and finding Atkins could not build the dock without LOLT's permission. Both the State and Atkins filed motions to alter or amend the judgment; the master denied Atkins' motion, but granted the State's in part on an issue not relevant here. This appeal followed.

## LAW/ANALYSIS

### *Standard of Review*

A suit for declaratory judgment may be legal or equitable, and is characterized as such by the nature of the underlying issue outlined in the complaint. *See Felts v. Richland County,* 303 S.C. 354, 400 S.E.2d 781 (1991); *Clark v. Hargrave,* 323 S.C. 84, 473 S.E.2d 474 (Ct.App.1996). Although an action to quiet title generally lies in equity, the main purpose of the complaint in this instance concerns the determination of title to real property.

A determination of title is legal in nature. *Wigfall v. Fobbs,* 295 S.C. 59, 367 S.E.2d 156 (1988); *Eldridge v. City of Greenwood,* 331 S.C. 398, 503 S.E.2d 191 (Ct.App.1998). Because this is a law case tried by the master alone with direct appeal to the supreme court, our review is limited to correcting errors of law. Accordingly, we will affirm the master's factual findings if there is any evidence in the record which

reasonably supports them. *Eldridge,* 331 S.C. at 416, 503 S.E.2d at 200; *Clark,* 323 S.C. at 87, 473 S.E.2d at 476.

## I. Tidelands Ownership

Atkins first argues the master erred in concluding the State granted the tidelands at issue to LOLT. We find no error.

The State of South Carolina holds presumptive title to all tidelands within its borders, which are held in trust for the benefit of the public. *See Coburg Dairy, Inc. v. Lesser,* 318 S.C. 510, 458 S.E.2d 547 (1995); *Hobonny Club, Inc. v. McEachern,* 272 S.C. 392, 252 S.E.2d 133 (1979). The State may, however, grant private individuals an ownership interest in tidelands. *See Hobonny,* 272 S.C. at 396, 252 S.E.2d at 136 ("Despite the special status accorded tidelands, the government, and specifically the King of England, had the power to grant, and did in fact grant, tidelands to subjects, who exercised private ownership."); *State v. Holston Land Co.,* 272 S.C. 65, 68, 248 S.E.2d 922, 924 (1978) ("The law in South Carolina is well settled that a grant conveying 'marshland' can give rise to private ownership of property to the mean low water mark.").

Traditionally, South Carolina has granted private rights to tidelands through acts of the Legislature. *See State v. Pacific Guano Co.,* 22 S.C. 50, 84 (1884) ("[I]n order to give effect to an alienation which the [S]tate might undertake to make[,] it would be necessary to have a special act of the [L]egislature expressing in terms and formally such intention."). Because tidelands are held in public trust, a grant of private ownership must contain "specific language, either in the deed or on the plat, showing that [the grant] was intended to go below high water mark...." *Hobonny,* 272 S.C. at 396, 252 S.E.2d at 135 (quoting *State v. Hardee,* 259 S.C. 535, 543, 193 S.E.2d 497, 500 (1972)); *see State v. Yelsen Land Co.,* 265 S.C. 78, 82, 216 S.E.2d 876, 878 (1975) ("Under well settled rules of construction ... boundaries [subject to the ebb and flow of the tide] will convey land only to the high water mark in the absence of specific language, either in the grant or upon a plat, showing that it was intended to convey land below the high water mark.").

Atkins claims the 1836 grant from the State of South Carolina to Edward C. Peronneau is ambiguous, and therefore lacks the specificity required to demonstrate an intentional transfer of title. We disagree.

■■■■■ A grant from the State purporting to vest title to tidelands in a private party is construed strictly in favor of the government and against the grantee. *See Pacific Guano*, 22 S.C. at 86 ("In all grants from the government to the subject, the terms of the grant are to be taken most strongly against the grantee, and in favor of the grantor . . . ."); *see also State v. Fain*, 273 S.C. 748, 259 S.E.2d 606 (1979). Consequently, the party asserting a transfer of title bears the burden of proving its own good title. *See Pacific Guano*, 22 S.C. at 74 ("[Claimants must show] that they or those from whom they hold acquired title . . . either from the British crown before the revolution, or from the state since that time[.]"); *Fain*, 273 S.C. at 752, 259 S.E.2d at 608 ("[T]he State comes into court with a presumption of title, and, if an individual is to prevail, he must recover upon the strength of his own title, of which he must make proof.").

■■■■■ To establish fee simple ownership of the marshland tract, therefore, LOLT must show (1) its predecessors in title possessed a valid grant, and (2) the grant's language was sufficient to convey the land below the high water mark to Peronneau. *Holston*, 272 S.C. at 66, 248 S.E.2d at 923. Since the parties stipulated to LOLT's unbroken chain of title flowing from the State's grant, the only question remaining is whether the grant itself adequately conveyed the tideland acreage. *See id.* at 67, 248 S.E.2d at 923 (stating that where the State conceded property granted by the sovereign was traceable in a complete chain, the only issue to determine was whether the grant "evidenced an intent to convey property below the high water mark"). We believe the evidence over-whelmingly supports the master's finding that it did.[4]

---

4. We note the parties' stipulation that LOLT's "448 acre tract is a portion of the *marshlands* shown on the plat," generally is sufficient to prove LOLT's good title without further inquiry. *See, e.g., Conch Creek Corp. v. Guess*, 263 S.C. 211, 214, 209 S.E.2d 560, 561 (1974) ("The [State's] admission in this case, that the entire area included in the grant consisted of tidelands . . . *conclusively showed* that the grant extended to the low water mark.") (emphasis added); *Lane v. McEac-*

The grant to Peronneau describes the property transferred as:

> Eleven Hundred and Two Acres Surveyed for him this 14[th] day of January 1836, Situate in Charleston District, on the West side of Ashley River, Branch Waters of Charleston Harbour—

In addition, the certification of James Kingman, who surveyed the property and prepared the plat on February 10, 1836, states:

> I do hereby Certify for Edward C. Peronneau a Tract of Marsh Land containing One Thousand One Hundred and Two Acres, Surveyed for him the 14[th] day of January 1836 Situate in Charleston District on the West Side of Ashley River, Branch Waters of Charleston Harbour, Bounded South Easterly by Lucas and Said Edward C. Peronneau and on all other Sides by Ashley River—And hath such form and Marks as the above Plat Represents—

Finally, the plat, incorporated into the grant, clearly depicts an area delineated as "1102 acres," bounded on one side by the land of Lucas and Edward C. Peronneau and on all other sides by the Ashley River, with "Marsh" appearing twice on its face.[5] These facts convince us the master correctly ruled the grant from the State of South Carolina intended to convey fee simple title of the tidelands to Peronneau. *See, e.g., id.* at 67–68, 248 S.E.2d at 923–24 (finding that when read together, a grant accompanied by a legend describing a "tract of marsh land" and a plat referencing "two hundred acres of marsh land" evinced a "clear intent to convey the disputed tidelands . . . to the usual low water mark"); *see also Coburg,* 318 S.C. at 513 n. 3, 458 S.E.2d at 548 n. 3 (stating a plat incorporated

---

*hern,* 251 S.C. 272, 162 S.E.2d 174 (1968) (finding the State's stipulated admission that the tidelands in question were within the perimeter of a plat annexed to a valid grant to claimant's predecessors in interest adequately reflected an intent to convey title without resorting to construction of the grant or plat). However, since the stipulation herein expressly reserved the State's right to challenge LOLT's ownership, we proceed with an analysis of the evidence purporting to show intent.

5. Indeed, the parties stipulated the plat rendered in 1836 and annexed to Peronneau's grant depicts "1102 acres of *marsh* situate on the west side of the Ashley River."

by reference into the grant can provide the requisite intent to convey tidelands).

Furthermore, expert trial testimony sustains this conclusion. Mark Busey, crew supervisor for Southeastern Surveying, testified as an expert in the field of surveying, including the preparation and interpretation of plats. Prior to trial, Busey produced a computer-generated overlay of the original survey plat by James Kingman. During his testimony Busey used the overlay in conjunction with modern-day aerial photographs and tax maps of the area. The resulting comparison enabled Busey to identify the Ashley River, inlets, creeks, islands, and marshland on both the 1836 plat and the aerial photos. Busey ultimately concluded the 448–acre tract owned by LOLT is a portion of the marsh as set forth on the 1836 plat.

We therefore agree with the master, whose order stated:

> Given the limitations of surveying in 1836, the results of placing the 1836 overlay on top of the modern photo map[s] are remarkable. It is possible to identify numerous geographic features, including many inlets that still remain visible.
>
> There is simply no question the 448.40 acres in question comes out of the 1,102 acres granted by the State to Edward Peronneau in 1836.

*See Hobonny,* 272 S.C. at 398, 252 S.E.2d at 136 (where plats incorporated into grants showed boundaries of tracts conveyed and State conceded plats embraced tidelands, court concluded grantor intended to convey tidelands, stating "[i]t is difficult to imagine how more precisely to express intent as to the location of boundaries than to incorporate an accurate plat in the description ....."); *see also Conch Creek Corp. v. Guess,* 263 S.C. 211, 214, 209 S.E.2d 560, 561 (1974) ("No suggestion is made as to what the purpose of the grant could have been, if not to convey marshland or tideland, for that was the character or nature of the entire property included. Any other construction would completely defeat the grant.").[6]

---

6. The master found LOLT was the "sole owner in fee simple" of the 448–acre tract, "subject only to the public trust as administered by the

## II. Atkins' Right to Wharf Over the Tidelands

■ Atkins further asserts that even if LOLT owns the tidelands in fee, he retains an upland owner's riparian right to

State of South Carolina." As both parties correctly note, the public trust doctrine applies to *"all* lands beneath waters influenced by the ebb and flow of the tide." *Phillips Petroleum Co. v. Miss.*, 484 U.S. 469, 479–80, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988). They further recognize, again accurately, that the doctrine differentiates between private, proprietary title *(jus privatum)*, and public trust title *(jus publicum)*. However, the master's conclusion that a grant of tidelands from the State of South Carolina can convey *only* the *jus privatum* interest is erroneous. Although some states disallow conveyance of the *jus publicum*, South Carolina does not. *See, e.g., Haesloop v. City Council of Charleston,* 123 S.C. 272, 282, 115 S.E. 596, 599–600 (1923) ("[T]he state, through the Legislature . . . not only vested in the city council [its] proprietary right in and dominion over this land, the jus privatum . . ., *but also released the right that the state itself possessed, the jus publicum. . . . [I]t was a grant of the fee, with unlimited power of disposal . . . ."*) (emphasis added) (internal citation omitted); *State v. Pacific Guano Co.,* 22 S.C. 50, 83–84, 86 (1884) ("The state had in the beds of these tidal channels not only title as property, the jus privatum, but something more, the jus publicum. . . . *There seems to be no doubt, however, that the state as such trustee has the power to dispose of these beds as she may think best for her citizens . . . .* [The rule that all grants from the government are construed against the grantee] applies a fortiori to a case where such grant by a government to individual proprietors *is claimed to be not merely a conveyance of title to land, but also a portion of that public domain which the government held in a fiduciary relation, for general and public use."*) (emphasis added); *see also Phillips,* 484 U.S. at 475, 108 S.Ct. 791 ("[I]ndividual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit."); *Shively v. Bowlby,* 152 U.S. 1, 47, 14 S.Ct. 548, 38 L.Ed. 331 (1894) ("[T]he ownership of and dominion and sovereignty over lands covered by tide waters . . . belong to the respective States . . . with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in such waters, and subject to the paramount right of [C]ongress to control their navigation. . . ."); *Marks v. Whitney,* 6 Cal.3d 251, 98 Cal.Rptr. 790, 491 P.2d 374, 381 (1971) ("It is a political question, within the wisdom and power of the Legislature, acting . . . as trustee, to determine whether public trust uses should be modified or extinguished. . . .").

However, because LOLT does not appeal the master's finding in this regard, and furthermore argues that a tidelands grant from the State of South Carolina conveys only the *jus privatum* interest in such property, we decline to address the question of whether the grant in this case conveyed solely that interest subject to the public trust. *See, e.g., Charleston Lumber Co., v. Miller Housing Corp.,* 338 S.C. 171, 525 S.E.2d 869 (2000) (stating that an unchallenged ruling, right or wrong, is the law of the case).

"wharf out" over LOLT's property to access the navigable waters of the Ashley River.[7] We disagree.

We first note that because Atkins' property adjoins a salt-water marsh, he has no truly "riparian" rights at all. A riparian owner is one whose land is traversed or bounded by a natural watercourse. *Black's Law Dictionary* 1327 (6th ed.1990); 78 Am.Jur.2d *Waters* § 260 (1975). A "water-course" is defined as running water flowing in a definite channel having a bed or banks, and includes streams, rivers, creeks, etc. *Black's Law Dictionary* 1592 (6th ed.1990). Modern usage, however, occasionally expands the definition to include lakes. *See Black's Law Dictionary* 1328 (7th ed.1999); 78 Am.Jur.2d § 260 ("[C]urrent usage ... has been said to have made the term 'riparian' an acceptable term as to land abutting upon either rivers or lakes.").

■ Owners of riparian land possess rights "relating to the water, its use, [and the] ownership of soil under the [water]...." *Black's Law Dictionary* 1327 (6th ed.1990); *Horry County v. Tilghman,* 283 S.C. 475, 480, 322 S.E.2d 831, 834 (Ct.App.1984) (equating riparian rights with "access to the water"). Under the common law, in addition to those rights of the public at large, a riparian owner possesses a property right incident to his ownership of the bank and bed to the thread of the watercourse. *See Shively v. Bowlby,* 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894). This right guarantees access from the front of the owner's land to the navigable part of the stream, and, when not forbidden by public law, may include the construction of landings, wharves or piers to facilitate such access. *See United States v. River Rouge Improvement Co.,* 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339 (1926).

■ Each state, however, is authorized to delineate the extent of riparian rights appurtenant to property within its borders. *Id.* at 418, 46 S.Ct. 144 ("It is well settled that *in the*

---

7. An "upland" owner is one holding title to land bordering a body of water. *Black's Law Dictionary* 1540 (6th ed.1990). "Wharfing out" describes the "[e]xercise of [an upland owner's] right to construct or maintain a wharf," including "a pier, a dock, or a related structure[,] to permit effective access to and from the water." *Waters and Water Rights,* § 6.01(a)(2) (Robert E. Beck ed., 1991).

*absence of a controlling local law* otherwise limiting the rights of a riparian owner . . . .") (emphasis added); *Packer v. Bird,* 137 U.S. 661, 669–70, 11 S.Ct. 210, 34 L.Ed. 819 (1891) ("[T]he right of the riparian owner . . . [is] limited according to the law of the state. . . ."). South Carolina follows the common law rule regarding riparian rights. *See State v. Head,* 330 S.C. 79, 498 S.E.2d 389 (Ct.App.1997) (stating adjacent property owners hold title from their shoreline to the center of a nontidal navigable stream bed subject to a public easement for use of the waterway). Accordingly, a riparian owner, subject to certain conditions, may wharf over a navigable river or stream. *McDaniel v. Greenville–Carolina Power Co.,* 95 S.C. 268, 272–73, 78 S.E. 980, 981 (1913) (" 'The rights of a riparian proprietor on a navigable stream are substantially the same as those attaching to riparian ownership on a nonnavigable watercourse, except that in some respects they are enlarged by the greater size and capacity of the stream and that there are some additional privileges connected with its navigable character. Such an owner has the right of access to the navigable part of the stream from the front of his lot, and provided he does not impede or obstruct navigation to build private wharves, landings, or piers, or use the water of the stream for any purposes.' ") (citations omitted).

Separate and apart from riparian rights, interests attached to property abutting an ocean, sea or lake are termed "littoral." *See Black's Law Dictionary* 1327 (6th ed. 1990) ("[Riparian] is sometimes used as relating to the shore of the sea or other tidal water, or of a lake or other considerable body of water not having the character of a watercourse. But this is not accurate. The proper word to be employed in such connections is 'littoral.' "); 78 Am.Jur.2d § 260 ("Strictly speaking, a riparian owner is one whose land abuts upon a river and a littoral owner is one whose land abuts upon a lake or sea."). Consequently, if Atkins possesses any rights inherent in his upland property, they would be littoral rights, not riparian.

 As with riparian rights, littoral rights are governed by the individual states. *See Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 378, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977) ("[P]roperty ownership is not governed by a general federal law, but rather by the laws of the several

States.... This principle applies to the banks and shores of waterways ....") (internal citation omitted); *Shively,* 152 U.S. at 57–58, 14 S.Ct. 548 ("[T]he title and rights of ... littoral proprietors in the soil below high water mark ... are governed by the laws of the several states, subject to the rights granted to the United States by the Constitution."). Prior to and at the time of the American Revolution, the British crown conveyed all lands under tide waters, along with governmental dominion over them, to the colonies and later states; each grant carried with it the attendant common law rights of a littoral landowner, except as modified by federal law or the "charters, constitutions, statutes, or usages of the several colonies and states." *Id.* at 14, 14 S.Ct. 548.

While the common law of England afforded an owner of land fronting a navigable tidal river *access* from his land to the water, this right was "not a title in the soil below high-water mark, *nor a right to build thereon,* but a right of access only, analogous to that of an abutter upon a highway." *Id.* (emphasis added). Consequently, the crown as tidelands owner was empowered to deem any structure erected without license below high-water mark a purpresture that could be destroyed or seized and rented for the crown's benefit.[8] *Id.* at 13, 14 S.Ct. 548. Nevertheless, in an effort to foster navigation and commerce in the nascent American economy, several colonial and state governments granted littoral owners greater rights and privileges than were found in English common law, including the right to build wharves. *Id.* at 18, 14 S.Ct. 548; *see, e.g., Great Cove Boat Club v. Bureau of Pub. Lands,* 672 A.2d 91 (Me.1996); *Wicks v. Howard,* 40 Md.App. 135, 388 A.2d 1250 (1978). South Carolina, however, was not among them.

▮▮▮▮▮ The extent of littoral rights in this jurisdiction is an unanswered question.[9] Atkins presents no authority, and

---

8. A purpresture is an encroachment by private use upon public rights and easements. *See Black's Law Dictionary* 1236 (6th ed.1990).

9. Although the extent of these rights heretofore has not been defined, our state clearly treats land bordering tidal water differently from riparian land. *See, e.g., State ex rel. McLeod v. Sloan Constr. Co.,* 284 S.C. 491, 498–99, 328 S.E.2d 84, 88 (Ct.App.1985) ("The State's argument simply ignores the different common law rules for construing riparian grants along tidal and nontidal waters.").

we are aware of none, outlining the scope of an upland owner's incidental property rights in tidelands. Accordingly, absent any showing of a legal enactment or demonstrated customary use of neighboring tidelands by littoral owners, we will apply the common law rule. *See State ex rel. McLeod v. Sloan Constr. Co., Inc.*, 284 S.C. 491, 496, 328 S.E.2d 84, 87 (Ct.App. 1985) ("[T]he English common law ordinarily is presumed to govern if there is no South Carolina authority to the contrary."); *Shively*, 152 U.S. at 14, 14 S.Ct. 548 ("The common law of England upon this subject ... is the law of this country, except so far as it has been modified. . . ."). As in historical England, therefore, we find an owner whose property abuts tidal waters possesses no littoral right to wharf out to a navigable stream, and therefore must obtain permission from the underlying landowner before erecting a dock, pier or comparable structure.[10]

Where wharfing out is not a littoral right and title to marshlands rests in the state, the requisite permission to erect a dock or similar structure by one not owning the underlying land usually is obtained through a regulatory licensing procedure.[11] *See Shively*, 152 U.S. at 41, 14 S.Ct. 548; *Waters and*

---

**10.** We further note that, even in states where the scope of littoral rights includes the prerogative to wharf out to a tidal navigable stream, the general rule is that such rights reside solely in the tidelands owner. 78 Am.Jur.2d *Waters* § 277 (1975) ("When the state has conveyed or leased tidelands bordering on tidal waters, the [littoral] rights are lodged in the tidelands' owner or lessee."); *see, e.g., Hoboken v. Penn. R. Co.*, 124 U.S. 656, 690–91, 8 S.Ct. 643, 31 L.Ed. 543 (1888) ("[T]he State [may] grant to a stranger lands constituting the shore of a navigable river under tide-water, below the high-water mark, to be occupied ... in such a manner as to cut off the access of the riparian owner from his land to the water . . . ."), *quoted with approval in Shively v. Bowlby*, 152 U.S. 1, 22, 14 S.Ct. 548, 38 L.Ed. 331 (1894); *Smith Tug & Barge Co. v. Columbia–Pacific Towing Corp.*, 250 Or. 612, 443 P.2d 205, 217 (1968); *cf. Horry County v. Tilghman*, 283 S.C. 475, 479, 322 S.E.2d 831, 833 (Ct.App.1984) ("When tidelands are condemned in fee simple, the condemnor acquires all rights appurtenant to the land."). Under these authorities, LOLT, as fee simple owner of the tidelands, now holds the littoral right of access to the adjacent Ashley River.

**11.** In South Carolina, regulatory authority is vested in DHEC's Office of Coastal Resource Management. *See Sierra Club v. Kiawah Resort Assocs.*, 318 S.C. 119, 128, 456 S.E.2d 397, 402 (1995) ("[U]nder the South Carolina Coastal Management Act, the State through the [Office

*Water Rights,* § 6.01(a)(2) (Robert E. Beck ed., 1991). A public permit, however, "does not displace the need to obtain the landowner's consent to wharf on land where title is in one other than the permitting authority." *Waters and Water Rights, supra,* § 6.01(a)(2). To the contrary, if ownership vests in private hands, an adjacent landowner desiring to build on tidelands must obtain the express consent of the fee simple owner. *Id.; see* 23A S.C. Ann. Regs. R.30–2(I)(4) (Supp.2000) ("If the final judicial decision determines that the critical area in question is owned by the adjoining critical area landowner and that the critical area landowner has a right to exclude others as part of the title, *the permit will not be issued unless the applicant presents [DHEC] with a copy of a deed, lease, or other instrument from the adjudicated critical area landowner that would allow construction of the proposed project, or written permission from such owner . . . .*") (emphasis added).

Because we agree with the master that LOLT owns the tidelands in fee, and find that in South Carolina the owner of adjacent upland property must gain permission from the fee owner to wharf across privately-owned tidelands to a navigable body of water, the decision of the master is

**AFFIRMED.**[12]

HEARN, C.J., and CURETON, J., concur.

of Coastal Resource Management] maintains control over the public trust [tide]lands.").

12. We note in passing that Atkins' argument regarding severance, and the master's reliance upon it, are misplaced. Because an upland owner possesses no littoral right to wharf out over adjacent tidelands in the first instance, any question of whether such a right was severed is irrelevant. Furthermore, although Atkins asserts, correctly, that his "riparian rights" argument is not based on the public trust doctrine, he does claim at several points in his final and reply briefs that he should be allowed to build the dock because, under the doctrine, LOLT can exclude neither the public nor him from utilizing the tidelands. This assertion, however, is erroneous.

Under the common law, the public trust doctrine secured the right of the public to navigate and fish upon otherwise private property. *See Shively v. Bowlby,* 152 U.S. 1, 13, 14 S.Ct. 548, 38 L.Ed. 331 (1894). Nevertheless, several states, including South Carolina, have expanded the doctrine to cover a broad range of water-based activities. *See Sierra Club v. Kiawah Resort Assocs.,* 318 S.C. 119, 127–28, 456 S.E.2d

397, 402 (1995) ("Under [the public trust doctrine], everyone has the inalienable right to breathe clean air; to drink safe water; to fish and sail, and recreate upon the high seas, territorial seas and navigable waters; as well as to land on the seashores and riverbanks.") (quoting Gregg L. Spyridon & Sam A. LeBlanc, *The Overriding Public Interest in Privately Owned Natural Resources: Fashioning a Cause of Action*, 6 Tul. Envtl. L.J. 287, 291 (1993)). Regardless of the scope of the doctrine in this state, and assuming, as we must, that LOLT owns fee title to the marshland bordering Atkins' property subject to the public trust, the doctrine affords no basis to claim a right to wharf out over another's private property. *See generally Munninghoff v. Wis. Conservation Comm'n*, 255 Wis. 252, 38 N.W.2d 712, 716 (1949) (holding muskrat trapping is not included in the public trust doctrine as it "involves the exercise of a property right in the land or the bottom" of the waterway; court distinguished the activity from those covered under the doctrine such as walking on the bottom while fishing, boating, standing on the bottom while bathing, and propelling a small vessel by poling along the bottom); *People v. Johnson*, 7 Misc.2d 385, 166 N.Y.S.2d 732, 736–37 (1957) ("While the public character of the waters is not affected by the ownership of the underlying land, neither does privately owned land lose its character by the inflow of navigable waters, except to the extent that private rights must yield to dominant rights of the public. The source of the public rights is the navigable water, and the underlying land is open to those activities of the public that are closely connected with the water.... But when an activity is more closely identified with the underlying land, when it entails some physical disturbance of that land not directly connected with the enjoyment of the waters, the character of the activity as private or public should be determined by the ownership of the lands.") (footnote omitted); *Sheftel v. Lebel*, 44 Mass.App.Ct. 175, 689 N.E.2d 500, 505 n. 9 (1998) ("[T]he public's rights with respect to fishing, fowling, and navigation on and over public trust lands do not encompass the right to affix any permanent structures to the soil of the tidal flats."); *State v. Longshore*, 141 Wash.2d 414, 5 P.3d 1256, 1263 (2000) (finding that because clamming "requires a digging down into the soil, a contact with and disturbance of the land itself," the public trust doctrine does not encompass the right to gather naturally occurring shellfish on private property).