707 S.E.2d 440

SCALISE DEVELOPMENT, INC., Respondent,

v.

TIDELANDS INVESTMENTS, LLC, Gary Ownbey, and Nominal Defendant Patrick Stathos, LLC, Defendants,

of whom Tidelands Investments, LLC and Gary Ownbey are Appellants.

No. 4791.

Court of Appeals of South Carolina.

Heard Dec. 9, 2010.
Decided Feb. 16, 2011.

28

Randall K. Mullins and Jarrod E. Ownbey, both of North Myrtle Beach, for Appellants.

David B. Miller and George W. Redman, III, both of Myrtle Beach, for Respondent.

LOCKEMY, J.

In this breach of contract action, Gary Ownbey and Tidelands Investments, LLC (Tidelands) argue the special referee erred in granting Scalise Development, Inc.'s motion for partial summary judgment. We affirm.

## FACTS

On March 28, 2005, Scalise entered into a contract with Ownbey and Tidelands (the Appellants) to purchase "9.5 + acres" (the Property) in Murrells Inlet, South Carolina for $9,400,000. Pursuant to the contract, the Property included the former Voyager's View Marina as well as acreage on Business 17 and the former Plantation Kitchen restaurant. The contract provided the Property was to consist of at least 9.5 acres and the Appellants were to convey marketable title and deliver a proper general warranty deed to Scalise before the July 28, 2005 closing date. The contract also provided Scalise was to pay a $50,000 earnest money deposit. Scalise held the option to extend the closing date for two additional thirty-day periods upon the payment of an additional $50,000 earnest money deposit for each extension.

Scalise's development plans for the Property included a mix of high-end residential and light retail/commercial uses. Pursuant to the Georgetown County Planned District Development (PDD) Ordinance, property must consist of a minimum of ten acres to qualify for a commercial planned unit development. Scalise intended to combine the Property with an adjoining one acre tract in order to have the requisite acreage to apply for a PDD zoning designation.[1] At the time the contract was signed, Tidelands owned a portion of the Property and Ownbey had a contract to purchase the Voyager's View Marina and Plantation Kitchen properties from Isadore Limit-

---

1. Georgetown County ultimately determined Scalise did not have the requisite ten acres in order to qualify for a PDD plan.

ed Liability, LLC (Isadore).[2] Ownbey did not acquire these portions of the Property until December 15, 2005, after the closing date.

In a June 9, 2005 letter to the Appellants, counsel for Scalise expressed numerous title concerns regarding the Property. On July 28, 2005, Scalise elected to extend the closing date an additional thirty days. Thereafter, on August 29, 2005, Scalise again elected to extend the closing date an additional thirty days. On September 23, 2005, the Appellants declined to grant any further extensions and made a claim to Scalise's earnest money deposits in the event Scalise failed to perform under the contract by the closing date. On October 21, 2005, Scalise demanded the return of all of its earnest money deposits pursuant to the terms of the contract. The parties continued to negotiate after the expiration of the contract; however, their negotiations ended without resolution.

In June 2006, Scalise filed suit against the Appellants alleging causes of action for breach of contract and declaratory judgment.[3] Scalise maintained the Appellants failed to convey marketable title to the Property by general warranty deed, and that it was entitled to reimbursement of the $150,000 in earnest money it paid as well as attorney's fees and damages.[4]

In December 2007, Scalise filed a motion for summary judgment as to its breach of contract claim. In February 2009, the special referee issued an order granting Scalise's motion for partial summary judgment, finding the Appellants did not convey marketable title to at least 9.5 acres by general warranty deed on September 28, 2005. The special referee determined the Property had several defects that made it unmarketable, including: (1) Ruth Street was subject to *Blue*

---

2. Ownbey and his brother own Tidelands Investments, Inc.

3. While this action was pending, the Appellants conveyed the Property to various third-party purchasers. The Voyager's View Marina parcel was purchased by Inlet Marina and Boathouse, LLC (Inlet). Inlet later commenced an action to quiet title to the parcel.

4. According to the Appellants' brief, their answer denied Scalise's claims and asserted a counterclaim for the return of the earnest money in their favor.

*Ridge*[5] easement rights; (2) a substantial portion of the Property was below the mean high water mark; (3) only 8.05 acres could be conveyed; (4) Judge Maring's order created a break in the chain of title; (5) the Property was subject to two commercial casino boat leases; and (6) the Property was previously conveyed to a non-existent entity. The special referee found Scalise was entitled to reimbursement of its earnest money deposits, including all accrued interest, and an evidentiary damages hearing. The Appellants appealed.

## STANDARD OF REVIEW

When reviewing the grant of a summary judgment motion, this court applies the same standard of review as the trial court under Rule 56, SCRCP. *Miller v. Blumenthal Mills, Inc.*, 365 S.C. 204, 219, 616 S.E.2d 722, 729 (Ct.App.2005). Summary judgment is proper when no issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), SCRCP. In determining whether any triable issue of fact exists, the evidence and all reasonable inferences must be viewed in the light most favorable to the non-moving party. *Pye v. Estate of Fox*, 369 S.C. 555, 563, 633 S.E.2d 505, 509 (2006).

## LAW/ANALYSIS

The Appellants argue the special referee erred in granting Scalise's motion for partial summary judgment. Specifically, they maintain the special referee erred in finding (1) Ruth Street was subject to *Blue Ridge* easement rights and the claims of Ruth Macklen or her heirs; (2) a portion of the Property was below the mean high water mark; (3) only 8.05 acres were conveyed; (4) Judge Maring's order created a break in the chain of title; and (5) the Property was subject to commercial casino boat leases. We address these arguments in turn.

### I. Ruth Street/Ruth Macklen

#### A. Ruth Street

 Ruth and R.W. Macklen were predecessors in title to portions of the Property. In February 1980, the Macklens

---

5. *Blue Ridge Realty Co. v. Williamson*, 247 S.C. 112, 145 S.E.2d 922 (1965).

recorded a plat (Ruth Street Plat) in Georgetown County. The Ruth Street Plat depicts six square blocks of subdivided lots bisected by Ruth Street. After the Ruth Street Plat was recorded, numerous conveyances of the lots were made with reference to the Ruth Street Plat.

The special referee determined the Appellants were unable to convey marketable title to Ruth Street by proper general warranty deed. The special referee found Ruth Street was "a classic example of a *Blue Ridge* easement." In *Blue Ridge,* our supreme court held that "when the owner of land has it subdivided and platted into lots and streets and sells and conveys the lots with reference to the plat, he thereby dedicates said streets to the use of such lot owners, their successors in title, and the public." 247 S.C. at 118, 145 S.E.2d at 925. Pursuant to *Blue Ridge,* "persons who own lots fronting on or adjacent to property dedicated as public streets or highways have such special property interests as entitle them to maintain a suit for the enforcement and preservation of the use of the property as such." *Id.* at 121–22, 145 S.E.2d at 926.

The special referee, quoting *Sanders v. Coastal Capital Ventures, Inc.,* 296 S.C. 132, 134, 370 S.E.2d 903, 905 (Ct.App.1988), also noted that "a purchaser of realty cannot be required to take doubtful title" and "[i]f there is a reasonable probability of litigation with respect to the title, it is unmarketable." "To be marketable, a title need not be flawless." *Gibbs v. G.K.H., Inc.,* 311 S.C. 103, 105, 427 S.E.2d 701, 702 (Ct.App.1993). "Rather, a marketable title is one free from encumbrances and any reasonable doubt to its validity." *Id.* "It is a title which a reasonable purchaser, well-informed as to the facts and their legal significance, is ready and willing to accept." *Id.*

The Appellants argue there was no reasonable probability of litigation with respect to Ruth Street. They assert no one has made a claim to use the Ruth Street right of way. Additionally, the Appellants contend the parties' contract requires conveyances be made "subject to all easements as well as covenants of record (provided they do not make the title unmarketable) and to all government statutes, ordinances, rules and

regulations." [6] Scalise argues there were no marketability requirement exceptions made for Ruth Street and the Appellants were required to convey Ruth Street by the delivery of a general warranty deed. Scalise maintains third party claims could prevent it from using Ruth Street for any purpose other than a road, and therefore, the Appellants could not convey marketable title by general warranty deed.

We agree with Scalise. In his June 9, 2005 letter to the Appellants, counsel for Scalise notified the Appellants of the Ruth Street title defect. In his deposition, Steven Querin, counsel for the Appellants, confirmed he discussed the necessity of a Statutory Road Closing Action in order to achieve marketable title, however no action was ever commenced. While Querin maintained in his deposition that title to Ruth Street was marketable, he also admitted Ruth Street could not be conveyed free and clear of the rights of others. Querin also stated he recommended conveying Ruth Street by quitclaim deed "because of the issues we've been discussing . . . [r]egarding the rights of others to Ruth Street." [7] Based on the foregoing, we find the Appellants were unable to convey marketable title to Ruth Street by proper general warranty deed.

## B. Claims of Ruth Macklen

In April 1998, Ruth Macklen attempted to convey Ruth Street and several lots. The deeds purporting to divest her interest conveyed the property to RCP, LLC; however, the

---

6. The Appellants also argue one of the deeds conveying an interest in Ruth Street referred to the Ruth Street Plat as a "proposed plan for subdivision imposed hereon in pencil, subject to change." The Appellants maintain that whether the Ruth Street Plat was a proposed plan subject to change or a recorded final plat raises a genuine issue of material fact with respect to the alleged *Blue Ridge* easement rights. This argument is not preserved for our review, as it was never raised to and ruled upon by the special referee. *See S.C. Dept. of Transp. v. First Carolina Corp. of S.C.*, 372 S.C. 295, 301, 641 S.E.2d 903, 907 (2007) (holding that in order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial judge).

7. The Appellants ultimately sold Ruth Street and an adjoining portion of the Property after this litigation began. The adjoining portion of the Property was conveyed by general warranty deed; however, Ruth Street was conveyed by a quitclaim deed.

Secretary of State's records indicate RCP, LLC was not formed until 2003. In his June 9, 2005 letter to the Appellants, counsel for Scalise asserted this title defect could result in some interest remaining vested in Ruth Macklen, her heirs, or other predecessors in interest. The special referee noted the Appellants did not dispute that this defect was not addressed prior to closing, and therefore, found the Appellants were unable to convey marketable title by general warranty deed to that portion of the Property.

The Appellants argue the correct name of the intended grantee was RCP Construction, LLC and admit there "may need to be a corrective deed." However, they contend the "intended conveyance renders the likelihood of litigation concerning the Ruth Street easement ... to be a virtual non-issue." Scalise argues the Appellants' admission that the deed is not correct is evidence of a break in the chain of title, and thus, the Appellants were unable to convey marketable title to the Property.

We agree with Scalise. The Appellants were aware of this title defect and did not obtain a corrective deed identifying the proper grantee prior to the closing date. Therefore, the Appellants were unable to convey marketable title by general warranty deed.

## II. High Water Mark

The State of South Carolina holds presumptive title to all tidelands below the mean high water mark, which are held in trust for the benefit of the public. *Lowcountry Open Land Trust v. State*, 347 S.C. 96, 102, 552 S.E.2d 778, 781–82 (Ct.App.2001). "A grant from the State purporting to vest title to tidelands in a private party is construed strictly in favor of the government and against the grantee." *Id.* at 103, 522 S.E.2d at 782. "Consequently, the party asserting a transfer of title bears the burden of proving its own good title." *Id.* Here, the special referee determined 1.16 acres of the Property was below the mean high water mark and in the tidal waters of Murrells Inlet, and therefore, the Appellants could not convey marketable title to the Property by general warranty deed on September 28, 2005.

The Appellants argue Scalise failed to object to the Property's title based on the portion of the Property below the mean high water mark before the closing date, and failed to give the Appellants an opportunity to cure the defect. They also argue the Property was operated as a marina during their ownership and that Scalise intended to use the Property for the same purpose; therefore, Scalise could not object to the Property's public use, because it intended to use the Property for a marina. The Appellants also maintain the contract provides that all conveyances are made "subject to all easements, as well as covenants of record (provided they do not make the title unmarketable) and to all governmental statutes, ordinances, rules and regulations."[8] The Appellants assert this case is similar to *McMaster v. Strickland*, 305 S.C. 527, 530, 409 S.E.2d 440, 442 (Ct.App.1991), in which this court held the trial court erred in finding property designated as "wetlands" was unmarketable, opining that nothing in the record indicated the sellers did not own the disputed property or that it was unlawful to sell the property. The Appellants contend there was ample evidence they owned the disputed portion of the Property.

Scalise argues the record contains no evidence the Appellants owned the portions of the Property below the mean high water mark. Scalise maintains that while the Appellants claim Scalise waived its right to object to this title defect, the affidavit of Scalise's attorney, Claude Epps, indicates this issue was the subject of public hearings held by Georgetown County, and the position taken by Georgetown County was reported in the local media. Scalise also contends the June 9, 2005 letter sent to the Appellants' counsel noted Scalise was not required to make title objections at any time prior to closing.

We agree with Scalise. Here, unlike in *McMaster*, there was evidence the Appellants did not own the portions of the Property below the mean high water mark. Scalise intro-

---

8. The Appellants arguments that (1) the prior owners possessed a permit to dredge the marina basin and (2) the marina basin was not "coastal water" are not preserved for our review. *See S.C. Dep't of Transp. v. First Carolina Corp. of S.C.*, 372 S.C. at 301, 641 S.E.2d at 907 (holding that in order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial judge).

duced Epps's affidavit, which stated that Georgetown County required Scalise to prove it owned fee simple title to the tidelands and real property underlying the marina. According to Epps, Georgetown County asked Scalise to produce a King's Grant of the property to predecessors in interest. Counsel for Scalise was unable to find a King's Grant to the disputed portions of the Property and, according to Epps, the Appellants were also unable to obtain fee simple title. Additionally, we find Scalise did not waive its right to object to this title defect. The contract does not provide that Scalise was required to notify the Appellants of all title objections prior to closing, or provide the Appellants the opportunity to cure any defects. In a letter to the Appellants' counsel, counsel for Scalise stated that "the contract between our respective clients does not require us to make objections to title at any time prior to closing. Accordingly, we reserve all rights regarding making title objections up to and including the day of closing." Pursuant to the contract, the Appellants were required to convey marketable title to at least 9.5 acres to Scalise. Because the Appellants did not hold title to the 1.16 acres of the Property below the mean high water mark, they were unable to convey marketable title to at least 9.5 acres.

### III. Only 8.05 acres conveyed

Pursuant to the contract, the Property was to consist of "at least 9.5 acres." This acreage was necessary for Scalise to qualify for the PDD zoning designation. Addendum 2 of the contract provides:

> [I]f Buyer is unable to obtain all approvals necessary for the Buyer to develop this property in accordance with the Buyer's intended use by the scheduled closing date as provided hereinabove, the Buyer shall have the option to either terminate this agreement and receive a refund of its earnest money deposit, or at Buyer's option, the Buyer may pay an additional $50,000 earnest money to extend the closing date for an additional thirty (30) days.... If Buyer needs to extend for an additional thirty (30) days ... then Buyer agrees to pay an additional $50,000 earnest money.... If the Buyer does so agree to pay the additional $50,000/$50,000 earnest money and extend this Agreement, then the entire earnest money ... shall be non-refundable,

provided the Seller is willing and able to perform under the provisions of this Agreement.

The special referee determined the Appellants were unable to convey marketable title to "at least 9.5 acres" as required by the parties' contract. The special referee noted the Appellants were unable to convey marketable title to Ruth Street and the tidelands around the Voyager's View Marina.

The Appellants maintain the special referee improperly inferred that the Property was unmarketable because of the Zoning Department's refusal to include the disputed portions of the Property in the required acreage. The Appellants argue Georgetown County's approval of Scalise's request for a PDD zoning designation was not a contingency of the contract. They contend that while the Zoning Department ordinances require at least ten acres to qualify for a PDD designation, this did not prevent Scalise from developing the Property or preclude it from seeking approval for a different zoning district designation. The Appellants argue the contract provides that Scalise's earnest money deposits were non-refundable, regardless of whether it received a PDD designation from the Georgetown County Zoning Department. Scalise does not argue it is excused from performance because Georgetown County would not allow the Property to be developed as intended. Rather, Scalise contends the Appellants could not convey at least 9.5 acres as required by the express terms of the contract.

We agree with Scalise. Addendum 2 of the contract provides Scalise's earnest money deposits were "non-refundable, provided the [Appellants were] *willing and able* to perform" under the contract. As discussed above, the Appellants did not own the portions of the Property below the high water mark and could not convey marketable title to Ruth Street. Therefore, the Appellants were unable to convey marketable title to at least 9.5 acres by proper general warranty deed as required by the express terms of the contract.

## IV. Judge Maring's Order

■ In the mid–1990s, members of the Player family, predecessors in interest to portions of the Property, incurred a sizable judgment lien following a bungee jumping accident.

The Steinke family, the plaintiffs in the action against the Players, undertook to set aside conveyances made by the Players in anticipation of the judgment. Portions of the Property the Players conveyed to Isadore (which Isadore ultimately conveyed to Ownbey), including the Voyager's View Marina, were at issue. In March 1997, circuit court Judge David Maring issued an order holding "[the Players'] interest in any and all property transferred ... remained the same after the transfers as it existed immediately prior to the transfers."

The special referee determined Judge Maring's order setting aside the Players' conveyances created a break in the chain of title, thus rendering title to the Property unmarketable. On appeal, the Appellants admit they should have obtained a quitclaim deed from Mr. Player, however they argue any effort to secure a quitclaim deed would have been futile. The Appellants maintain Scalise abandoned the parties' contract by failing to respond to its September 23, 2005 letter sent in response to Scalise's request for an extension on the contract. The Appellants also contend they abandoned their efforts to obtain a quitclaim deed after Scalise's failure to respond. Scalise argues the Appellants' admission they should have obtained a quitclaim deed, as well as Inlet's action to quiet title, are proof the Property was not marketable.

We agree with Scalise. The Appellants' admission they should have obtained a quitclaim deed from Mr. Player is evidence of the Appellants' inability to convey marketable title by general warranty deed to Scalise. Furthermore, Inlet's action to quiet title is further evidence of the Appellants' inability to convey marketable title. Accordingly, we find the special referee did not err in finding title to the Property was unmarketable because Judge Maring's order created a break in the chain of title. *See Sanders*, 296 S.C. at 134, 370 S.E.2d at 905 (holding "[i]f there is a reasonable probability of litigation with respect to [a] title, it is unmarketable").

## V. Casino Boats Leases

In October 2001, Isadore entered into a two-year lease agreement with Dinner Cruises, LLC. The lease agreement provided Dinner Cruises was entitled to lease two hundred

feet of dockage at the Voyager's View Marina for commercial use, as well as the right to park vehicles for employees and customers in the Voyager's View Marina parking area. Dinner Cruises also had the option of extending the original lease term an additional eight years. In 2003, Isadore entered into an unrecorded ten-year lease agreement with Palmetto Princess, LLC. The lease agreement provided Palmetto Princess would pay rent according to revenue derived from video gaming machines.

Pursuant to the parties' contract, "closing . . . is contingent on [Scalise] receiving verification adequate to [its] counsel that the [P]roperty is not subject to any existing contractual obligation, including, without limitation, any obligation in respect to any 'casino boat' operation." In an April 28, 2005 letter to the Appellants, counsel for Scalise stated "the issue of the nebulous casino boat lease must be concluded prior to closing." Counsel further stated that "either sufficient evidence terminating this lease must be presented or, in the alternative, a court order reflecting the same may be necessary. Regardless, the obligation of clearing the casino boat lease issue is strictly that of your client." An October 11, 2005 email sent from the Appellants' counsel to Scalise's counsel indicates the casino boat lease issue was not resolved prior to the closing date.

The special referee determined the two outstanding casino boat leases prevented the Appellants from conveying marketable title to the Property by general warranty deed. The Appellants argue the Dinner Cruises lease fails due to lack of consideration and because the intended purpose of the lease was illegal at the time the lease was signed. Scalise argues the casino boat lease issue was not resolved prior to the closing date. Scalise also maintains the Appellants' lack of consideration and illegal purpose arguments could constitute affirmative defenses in the event of litigation, but they could not be used to prevent any claim from being pursued in litigation.

We agree with the special referee that the casino boat leases prevented the Appellants from conveying marketable title to the Property by delivery of a proper general warranty deed. The Appellants do not argue, and the record does not

reflect, that the casino boat lease issue was resolved prior to the closing date as required by the contract.

## CONCLUSION

The special referee did not err in finding the Appellants were unable to convey marketable title to the Property by proper general warranty deed. Accordingly, the decision of the special referee is

**AFFIRMED.**

HUFF and KONDUROS, JJ., concur.